**STATE OF VERMONT**
**ENVIRONMENTAL COURT**

| | |
|---|---|
| | } |
| | } Docket No. 129-5-06 Vtec |
| | } Docket No. 242-10-06 Vtec |
| In re JLD Properties of St. Albans, LLC | } Docket No. 92-5-07 Vtec |
| | } Docket No. 221-10-07 Vtec |
| | } Docket No. 80-4-08 Vtec |
| | } Docket No. 116-6-08 Vtec |
| | } |

## Index to the Decision on the Merits

| Section | Page No. |
|---|---|
| Procedural History | 2 |
| Factual Findings | 6 |
|    I. The proposed development. | 6 |
|    II. The Appellants and their interests. | 9 |
|    III. Changes to the proposed development, surrounding area, and environs. | 11 |
|    VI. Additional economic impacts of the current proposed project. | 14 |
|    V. Traffic impacts. | 15 |
|    VI. Impact upon prime agricultural soils. | 20 |
|    VII. A Wal-Mart "Super Store": is it to be, or not to be? | 22 |
| Discussion | 24 |
|    I. Remaining Procedural Disputes. | 24 |
|      a. Are the pending applications barred by the successive application doctrine? | 24 |
|      b. Do the identified appellants have standing to prosecute these appeals? | 27 |
|      c. Is it appropriate to impose the sanctions VNRC requests? | 31 |
|      d. May and should the Court take judicial notice of prior Act 250 permits? | 31 |
|    II. Remaining Act 250 Issues. | 33 |
|      a. Economic impacts (Act 250 criteria 6, 7, 9(A), and 9(H)). | 34 |
|      b. Traffic (criterion 5). | 38 |
|      c. Prime agricultural soils (criterion 9(B)). | 40 |
|      d. Conformance with Town and Regional Plans (criterion 10). | 45 |
|    III. Remaining Issues Concerning Municipal Permitting. | 47 |
|      a. Subdivision. | 48 |
|      b. Site plan, conditional use, and PUD approvals. | 49 |
| Conclusion | 51 |
| Exhibits 1 and 2 | 56 |

STATE OF VERMONT

ENVIRONMENTAL COURT

| | |
|---|---|
| In re JLD Properties of St. Albans, LLC } (Stormwater Discharge Permit) } } | Docket No. 129-5-06 Vtec |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re JLD Properties of St. Albans, LLC } (Municipal 4-Lot Subdivision) } } | Docket No. 242-10-06 Vtec |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re JLD Properties of St. Albans, LLC } (Municipal Site Plan & Conditional Use) } } | Docket No. 92-5-07 Vtec |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re JLD Properties of St. Albans, LLC } (Construction Discharge Permit) } } | Docket No. 221-10-07 Vtec |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re JLD Properties of St. Albans, LLC } (Act 250 Land Use Permit #6F0583) } } | Docket No. 80-4-08 Vtec |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re JLD Properties St. Albans, LLC } (Act 250 LUP #6F0583–Altered) } } | Docket No. 116-6-08 Vtec |

## Decision on the Merits

These consolidated appeals arise out of efforts by Appellee-Applicant JLD Properties of St. Albans, LLC ("JLD Properties" or "Applicant"), and its predecessors in interest to develop a large parcel of land in the Town of St. Albans ("Town") along U.S. Route 7 and just north of the City of St. Albans ("City") with a proposed retail discount center, operated as a Wal-Mart store.

The above Dockets suggest that these proceedings have had a multi-year history before this Court. In fact, the various state and local land use applications and their predecessors span a period of decades. In an effort to bring some finality to these proceedings, and after addressing numerous pretrial motions in the various Dockets, the Court conducted a multi-day trial at the

1

39

Franklin Superior Courthouse in St. Albans City, beginning on June 17, 2009. The Court then afforded the parties an opportunity to file proposed Findings of Fact and Conclusions of Law; some post-trial motions were also filed. This Decision is issued to address all the remaining post-trial motions and merits determinations now pending before the Court.

## Procedural History

As the pending appeals progressed through the discovery process and were prepared for trial, all pending appeals were consolidated. The following is a brief summary of the nature of the appeal, and the decision appealed from, in each Docket:

> Docket Number 129-5-06 Vtec concerns an appeal from the April 26, 2006 decision by the Department of Environmental Conservation ("DEC")[1] to issue Stormwater Discharge Permit #3655-INDS[2] to JLD Properties for its Wal-Mart project; this appeal was brought by the Vermont Natural Resources Council ("VNRC"), joined by Marie Frey, Richard Hudak, and the Northwest Citizens for Responsible Growth ("NWCRG").

> Docket Number 242-10-06 Vtec concerns an appeal from the September 22, 2006 determination by the Town of St. Albans Development Review Board ("DRB"), granting final plat approval for a four-lot subdivision of the entire tract of land owned by JLD Properties;[3] this appeal was brought by VNRC, joined by Marie Frey, Richard Hudak, and thirty members of the Town or adjoining municipalities.

> Docket Number 92-5-07 Vtec concerns an appeal from two April 26, 2007 determinations by the DRB, one granting site plan approval and the other granting conditional use approval, with both decisions also resulting in the granting of Planned Unit Development ("PUD") approval for the proposed project. Commons Associates ("Commons") filed this appeal; a cross-appeal was filed by VNRC, joined by Marie Frey, Richard Hudak, and forty-six members of the Town or adjoining municipalities.

> Docket Number 221-10-07 Vtec concerns an appeal from the September 12, 2007 DEC decision to issue Stormwater Discharge Permit #3655-INDC to JLD Properties, authorizing the proposed stormwater and runoff treatment procedures during the construction phase for the proposed Wal-Mart project, including related site work. This appeal was brought by VNRC, joined by Marie Frey, Richard Hudak, and NWCRG.

> Docket Number 80-4-08 Vtec concerns an appeal from the April 4, 2008 decision by the District #6 Environmental Commission ("District Commission") to issue Act 250 Land Use Permit #6F0583 for the proposed project, together with Findings of Fact, Conclusions of Law and Order in support thereof. The proposed project is identified

---

[1] The DEC is a subdivision of the State of Vermont Agency of Natural Resources.

[2] This permit relates to the treatment of stormwater during the operational phase of the proposed Wal-Mart.

[3] The entire tract encompasses 107± acres; the proposed Wal-Mart facility is to be located upon Lot 3, which includes 52.1± acres.

in Permit #6F0583 as including the construction of a 146,755-square-foot Wal-Mart retail store, with associated patios and walkways to be served by municipal water and sewer, parking spaces for 737 cars, 650 linear feet of entrance road, interconnected sidewalks, access right-of-way for future development and future growth center loop road, landscaping, lighting, interior circulation, grading, stormwater system construction, installation of utilities, and off-site roadway improvements to mitigate traffic safety or congestion problems. This appeal was brought by Commons.

> Docket Number 116-6-08 Vtec concerns an appeal of a May 16, 2008 determination by the District Commission, granting in part and denying in part motions filed with the District Commission by the Agency of Natural Resources ("ANR"), VNRC, NWCRG, Marie Frey, and Richard Hudak to alter the previously issued Act 250 Land Use Permit (LUP #6F0583). This last appeal to this Court was brought by VNRC, joined by Marie Frey, Richard Hudak, and NWCRG; cross-appeals were brought by Commons, the City, and ANR.

Appellee-Applicant JLD Properties is represented in all these proceedings by Stewart H. McConaughy, Esq., Robert F. O'Neill, Esq., and Ross A. Feldmann, Esq.; Appellant/Cross-Appellant VNRC and those it represents are represented by Jon Groveman, Esq. and Gerald R. Tarrant, Esq.; Appellant/Cross-Appellant Commons and Interested Party R.L. Vallee, Inc., are both represented by Jon T. Anderson, Esq. and David W. Rugh, Esq.; the City is represented by Brian S. Dunkiel, Esq.; ANR is represented by Judith L. Dillon, Esq.; the Town (an Interested Party in all Dockets) is represented by David A. Barra, Esq.; Interested Party Vermont Natural Resources Board ("NRB") Land Use Panel is represented by John H. Hasen, Esq.; Interested Party NRB Water Resources Panel is represented by Mark L. Lucas, Esq.; and Interested Party Vermont Agency of Transportation ("VTrans") is represented by John K. Dunleavy, Esq. and Trevor R. Lewis, Esq.

In the course of preparing for the trial in these consolidated appeals, the parties expended considerable time and resources in an effort to arrive at agreements on proposed revisions to different components of the proposed project, thereby narrowing the issues remaining to be resolved through trial. As a consequence of their efforts, JLD Properties, VNRC, NWCRG, Mary Frey, John Hudak, NRB, and the Town entered into a Settlement Agreement ("Stormwater Settlement Agreement," a copy of which is attached to this Decision as Exhibit 2). The parties' Stormwater Settlement Agreement memorializes that JLD Properties would incorporate "offset projects within the Stevens Brook Watershed," which are intended to mitigate possible adverse effects from sediment and nutrient discharges via stormwater that travels beyond the proposed on-site stormwater treatment facilities and the project site, occurring as a consequence of the

3

construction and operation of the proposed Wal-Mart. In consideration of JLD's pledge to incorporate these stormwater offset projects into a revised project plan, VNRC, NWCRG, Mary Frey, John Hudak, NRB, and the Town agreed to the dismissal of the stormwater appeals (Docket Nos. 129-5-06 Vtec and 221-10-07 Vtec) and to the withdrawal of the challenges raised by these appellants in Docket Nos. 92-5-07 Vtec, 80-4-08 Vtec, and 116-6-08 Vtec relating to water quality, erosion, drainage, and stormwater issues. The Court accepted these parties' filings and granted their dismissal requests when the request was filed on the first day of trial.

In regards to the cross-appeal filed by the City in the appeal of the altered Act 250 Permit (Docket No. 116-6-08 Vtec), the City and JLD entered into mediation, which resulted in the resolution of their dispute. The general subject of the City's cross-appeal was its concern that if the proposed Wal-Mart were approved, the City would suffer adverse economic impacts, particularly in regards to its downtown region. To address these concerns, JLD agreed (subject to any final order of this Court) to make certain payments to the City, make certain investments in City properties, and cooperate in certain revitalization efforts within the City. In return, the City agreed to the dismissal of its cross-appeal in Docket No. 116-6-08 Vtec, with prejudice and subject to the final order of this Court. A copy of the agreement between JLD Properties and the City is attached to this Decision as Exhibit 1.

The entries in the various Dockets memorialize the volume of pretrial issues addressed by the Court. In its March 16, 2009 Interim Decision on Multiple Motions, the Court determined that summary judgment was appropriate as to Questions 1, 2, 3, and 4 from VNRC's Statement of Questions in the appeal of the municipal site plan, conditional use, and PUD approvals (i.e., Docket No. 92-5-07 Vtec), since these Questions alleged conflicts of interest that the Court determined could not be the legal basis for the relief VNRC requested. The Court also reaffirmed in this Interim Decision its prior determination that VNRC's allegations of improper conduct and possible conflict of interest by District Commission members did not require dismissal and remand of Docket No. 116-6-08 Vtec. A further consequence of this determination was that VNRC's Question 1 in Docket No. 116-6-08 Vtec was dismissed.

As to VNRC's then-pending request that the Court conclude that JLD's revised Act 250 application in Docket No. 116-6-08 Vtec was improper under the doctrine of successive applications, and should therefore be dismissed, the Court concluded that such a legal question was too fact dependent, that there existed a dispute as to the material facts, and that therefore

4

47

neither party was entitled to summary judgment. Similarly, the Court declined to rule at that pretrial stage, as requested by JLD, that its current project _was_ _not_ an improper successive application. This legal issue is one of the first issues addressed in the Discussion section of this Decision.

As to JLD's subdivision application, VNRC's first three questions in its Statement of Questions presented a challenge concerning which version of the Town of St. Albans Zoning and Subdivision Bylaws ("Bylaws") applied to the proposed subdivision. However, the parties were able to resolve this legal issue, as reflected in the docket sheet entries for December 18, 2006. As a consequence of the resolution reached by the parties, Questions 1, 2, and 3 in Docket No. 242-10-06 Vtec were dismissed.

As a consequence of these various resolutions, whether by agreement of the parties or various pretrial determinations by the Court, the unresolved issues and remaining Dockets awaiting trial were reduced to the following:

➤ A limited set of issues concerning VNRC's appeal of the DRB determination on JLD's four-lot subdivision application (Docket No. 242-10-06 Vtec).

➤ The challenges remaining in the Commons' and VNRC's appeal of the DRB determination on JLD's site plan, conditional use, and PUD applications (Docket No. 92-5-07 Vtec).

➤ The challenges remaining in the appeals of the District Commission's determinations on JLD's Act 250 application. Since the appeal issues raised in the first Act 250 appeal (Docket No. 80-4-08 Vtec) were either duplicated or subsumed into the appeal of the District Commission determination on the various motions to alter (Docket No. 116-6-08 Vtec), only the latter Docket was truly at issue when trial commenced.

At the start of trial, the parties presented their various summaries of the remaining disputed issues in all Dockets that remained open. Their summaries revealed a consensus that the following six general issues remained in dispute and would therefore be the general subjects at trial:

1. Were the pending Act 250 and municipal applications barred by the legal doctrine prohibiting the consideration of similar successive applications?

2. Are the economic impacts from the current Wal-Mart project likely to be so adverse as to require rejection of the pending application, pursuant to the applicable Act 250 criteria and municipal zoning regulatory provisions?

3. Will the traffic generated by the proposed Wal-Mart cause negative impacts upon adjacent highways, even after the construction of mitigation measures and highway

5

43

improvements proposed by JLD, such that the Act 250 and municipal applications should be denied, or approved with appropriate additional conditions?

4. Whether the impact of the proposed Wal-Mart on identified prime agricultural soils requires denial of the applications?[4]

5. Does the proposed project comply with the applicable provisions of the St. Albans Town Plan and the North Country Regional Plan?

6. Should the Court impose in any approval it may issue the limitations concerning grocery and gasoline sales for which Commons advocates?

With this summary of the remaining disputed issues in mind, the Court received the parties' presentation of admissible evidence and legal arguments. The Court also visited the proposed site and related areas within the Town, the City and the adjacent Town of Swanton; these site visits provided useful context for the evidence that was offered and admitted at trial. Based upon such evidence, the Court renders the following Findings of Fact, Conclusions of Law and Order.[5]

## Factual Findings

### I. The proposed development.

1. JLD Properties owns 107± acres of land along the westerly side of U.S. Route 7 in St. Albans Town. The property once was the site of a family agricultural operation known as the Yandow Farm. This currently undeveloped parcel of land is located across Route 7 from the St. Albans Drive-In Theater and about a mile north of the boundary with the City. The project site is also located a short distance north of the junction between U.S. Route 7 and Vermont Route 207, which serves as access to the nearby on- and off-ramps for Exit 20 to Interstate 89.

2. The subject property is located in the Town of St. Albans Commercial and Commercial/Light Industrial zoning districts and in growth centers specifically identified by the

---

[4] JLD contends that positive partial findings its predecessor received under Act 250 criterion 9(B) in a prior Act 250 subdivision proceeding should be extended, thereby foreclosing that issue in this proceeding. We discuss this argument below beginning at page 24.

[5] In the course of the parties completing their post-trial filings, JLD filed a motion to dismiss Appellants VNRC, NWCRG, Marie Frey, Richard Hudak, and their fellow co-appellants in all appeals, as well as R.L. Vallee (a co-appellant with Commons), due to JLD's assertion that these appellants lack standing to prosecute their respective appeals. In response, VNRC and its co-appellants filed their objections to JLD's motion, together with two motions of their own: (1) a motion requesting that the court impose sanctions upon JLD, due to the alleged tardiness of JLD's dismissal motion, and (2) a motion requesting that the Court take judicial notice of the Act 250 land use permits for two preexisting developments (Franklin Park West and Franklin Business Park), not associated with JLD or its proposed Wal-Mart development, but that are also located adjacent to and rely upon access to U.S. Route 7.

Because these post-trial motions are so fact specific, we address each motion after the above Findings section.

44

Town and the Northwest Regional Planning Commission. The project site is located just south of the boundary line shared with the Town of Swanton, which has also designated a nearby area as a growth center. These various growth center designations have not been adopted by the State of Vermont.

3. JLD proposes to subdivide its parcel into four lots: Lot 1 of 9.6± acres and Lot 2 of 6.3± acres would both have road frontage on U.S. Route 7 and are not presently proposed for development, and no such development applications have been presented;[6] Lot 3 contains 52.1± acres and is the site of the proposed Wal-Mart development; and Lot 4 contains 38.9± acres, which would largely remain undeveloped. See Exhibit 1 ("Wal-Mart – JLD Properties Overall Property Plan").

4. The only portion proposed for development within Lot 4 is an internal road that transitions through the front lots and provides access between the lots and adjacent developments, and an additional access to U.S. Route 7 from the adjacent development to the south.

5. Portions of Lots 3 and 4 border Stevens Brook; JLD has identified 55± acres within Lots 3 and 4 and near Stevens Brook that it pledges will remain undisturbed and undeveloped.

6. The proposed development of Lot 3 consists of a proposed Wal-Mart discount store to be operated within a single-story building of 146,755 square feet. The discount store would also include a garden center, associated patios, and walkways. The building is proposed to be 1,300 feet off of the westerly boundary of U.S. Route 7 and approximately twenty-seven feet lower in elevation than that westerly highway boundary. The exterior of the building will be about twenty-eight feet high, with a peaked façade above the front entrance with a height of forty feet above the finished grade.

7. In addition to the building and garden center, the proposed project includes site work depicted in JLD's multi-page site plan (Exhibits 1–15) and supporting documents, including the following components:

a. grading and landscaping;

b. connection to municipal water supply and wastewater treatment systems;

c. construction of all support utilities (on-site water and sewer lines and electric and other utilities);

---

[6] JLD acknowledges that no development may occur on their Lots 1 and 2 without the prior issuance of the necessary state and municipal permits.

7

d. parking for 737 customer and employee vehicles;

e. lighting for the parking lot, building, access road, and signage;

f. construction of an on-site stormwater treatment system, and the stormwater offset projects referenced in the parties' Stormwater Settlement Agreement;

g. a 650-foot access road (with a center island planted with trees, and with additional trees and sidewalks lining both sides of the access road);

h. additional interior roadways for on-site and off-site vehicle travel; and

i. off-site highway and roadway improvements, intended to mitigate traffic safety and congestion problems.

8.     The proposed project also incorporates all conditional payments and other investments pledged by JLD Properties to the City in response to the City's concerns about the proposed Wal-Mart's possible adverse economic impacts upon the City in general and its downtown region in particular.

9.     JLD applied for an Act 250 permit for its current project by application dated December 21, 2005. The full Act 250 application and supporting schedules were admitted into evidence as JLD Exhibit 47. On April 4, 2008, the District Commission issued Act 250 Permit #6F0583 and its supporting Findings of Fact, Conclusions of Law and Order. In response to various motions to alter filed on behalf of ANR, VNRC, NWCRG, Marie Frey, and Richard Hudak, the District Commission issued its May 16, 2008 Memorandum of Decision, granting in part and denying in part the requested alterations to certain permit conditions. Each District Commission decision was appealed to this Court and is the subject of Docket Nos. 80-4-08 Vtec and 116-6-08 Vtec, respectively.

10.    JLD also applied for municipal site plan, conditional use, and PUD approvals on November 16, 2006, which the DRB granted on April 6, 2007. This application was admitted into evidence as JLD Exhibit 48. The appeals of those municipal determinations are the subject of Docket No. 92-5-07 Vtec.

11.    JLD's four-lot subdivision application (Exhibit 49) was approved by the DRB on September 22, 2006; the appeal of that municipal determination is the subject of Docket No. 242-10-06 Vtec.

12.    JLD initially filed its stormwater discharge permit application for the operation of the proposed Wal-Mart facility on July 29, 2004; the DEC issued Permit #3655-INDS on April 26, 2006. The appeal of that DEC determination is the subject of Docket No. 129-5-06 Vtec. DEC

8

also approved JLD's application for a stormwater permit for the construction phase of its project (DEC Permit #3655-INDC); the appeal of that permit is the subject of Docket No. 221-10-07 Vtec. As a consequence of the parties' Stormwater Settlement Agreement, JLD has revised its on- and off-site stormwater systems.

## II.    The Appellants and their interests.

13.    VNRC is a non-profit, non-governmental environmental organization with an office in Montpelier, Vermont. The Court is aware that VNRC has been an active participant in general environmental discussions throughout Vermont, and in specific Act 250 proceedings over a number of years, including the prior application for a Wal-Mart development on this site, reviewed fifteen years ago by the former Environmental Board and the Vermont Supreme Court. See In re Wal*Mart Stores, Inc. and The St. Albans Group, 167 Vt. 75 (1997).

14.    VNRC also participated in the municipal zoning and subdivision proceedings that are now on appeal before this Court, as did its co-appellants, NWCRG, Marie Frey, and Richard Hudak.

15.    In the current Act 250 proceedings, the District Commission concluded that VNRC was entitled to interested person status and had "a particularized interest protected by the criteria noted," all pursuant to 10 V.S.A. § 6085(c)(1)(e) and then-existing Environmental Board Rules 14(A)(5) and 14(I). In re JLD Props. of St. Albans, LLC, No. 6F0583, Findings of Fact, Conclusions of Law and Order at 3 (Dist. #6 Env. Comm'n Apr. 4, 2008) [hereinafter "2008 Dist. Commission Decision," a copy of which was admitted into evidence at trial as JLD Exhibit 30].[7] The District Commission concluded that VNRC was entitled to party status under Act 250 criteria 1, 1(B), 1(D), 1(E), 1(F), 1(G), 4, 5, 6, 7, 8, 8(A), 9(A), 9(B), 9(H), 9(K), and 10. JLD chose not to appeal these party status determinations in favor of VNRC. Id.

16.    Marie Frey and Richard Hudak are residents of the Town of Swanton and own and operate the Hudak Farm, an agricultural production and retail operation located in Swanton and along U.S. Route 7 about one third of a mile north of the project site. The District Commission

---

[7] We are directed to follow the general rule in de novo proceedings to look anew at the application as if no decision had been rendered below. See In re Killington, Ltd., 159 Vt. 206, 214 (1992) ("In a de novo proceeding, the [reviewing court or] Board is required to hear the matter as if there had been no prior proceedings in the district commission.") (citing In re Green Peak Estates, 154 Vt. 363, 372 (1990)). See also V.R.E.C.P. 5(g). However, this procedural rule only applies to the factual findings and legal conclusions preserved for our review on appeal. See 10 V.S.A. § 8504(h) (limiting the de novo hearing to "those issues which have been appealed"). To the extent that a finding or conclusion is not appealed, those determinations are final. 24 V.S.A. § 4472.

granted Ms. Frey and Mr. Hudak preliminary and final party status in the Act 250 proceeding under criteria 1(B), 1(C), 4, 5, 7, 8, 9(A), 9(B), 9(H), and 10. Id. JLD also chose not to appeal these party status determinations. Ms. Frey and Mr. Hudak also participated in the municipal zoning and subdivision proceedings; their right to participate in those proceedings and in these consolidated appeals had not been challenged until the post-trial dismissal motion filed by JLD.

17.    NWCRG is an organization of private citizens; its contact person was identified by the District Commission as Perry Cooper of Enosburg Falls, Vermont. 2008 Dist. Commission Decision at 3. The District Commission granted NWCRG preliminary and final party status in the Act 250 proceeding under criteria 1, 1(A), 1(B), 1(D), 1(E), 1(F), 1(G), 4, 5, 6, 7, 8, 8(A), 9(A), 9(B), 9(H), 9(K), and 10. No party appealed these party status determinations in favor of NWCRG. Id.

18.    Commons owns the shopping complex development commonly known as Highgate Commons, located along U.S. Route 7 about one third of a mile south of the project site. Commons either participated or received party status in the Act 250, municipal zoning and subdivision proceedings now before this Court. JLD does not contest the rights of Commons to party status or standing in any of the proceedings that remain on appeal before this Court.

19.    R.L. Vallee is a private corporation that owns and operates several retail establishments, including combined gas stations and convenience stores known as "Maplefields." One such R.L. Vallee operation is located in St. Albans Town, along U.S. Route 7, about one third of a mile south of the JLD/Wal-Mart project site.

20.    Access to this R.L. Vallee project site is from a curb cut intersection along Route 7, at the Highgate Commons retail development. Traffic from the proposed Wal-Mart will flow through this intersection. Due to the proposed project's impact upon the intersection used to access the R.L. Vallee gas station/convenience store, JLD has committed to making improvements to this and other intersections along Route 7.

21.    R.L. Vallee participated in the municipal zoning and subdivision proceedings. At no time prior to the conclusion of the trial in these consolidated appeals did JLD challenge R.L. Vallee's status as a party, including a party with standing to prosecute any of its appeals in these Dockets.

22.    R.L. Vallee and its co-appellant, Commons, sought this Court's additional authority to participate as a party in the latter Act 250 appeal (Docket No. 116-6-08 Vtec) with status under Act 250 criteria 7 (municipal services) and 9(A) (impact on growth). JLD did not contest this

request for additional party status. The Court granted the requested additional party status by Entry Order dated October 3, 2008.

23. R.L. Vallee and Commons expressed concerns that the proposed Wal-Mart not be allowed to operate as a Wal-Mart "Super Store," since such facilities have been known to include gas stations and grocery stores. The economic impact of such an operation has not been the subject of specific evidence presented by JLD in these proceedings.

24. The City, Town, and Northwest Regional Planning Commission appear as either appellants or interested persons in most (and, in the case of the Town, all) of these consolidated appeals. JLD has not challenged the authority of any of these entities to participate in one or more of these consolidated appeals.

25. ANR, NRB, and VTrans are all subdivisions of the State and have various regulatory and quasi-judicial responsibilities over issues that are material to JLD's proposed development. JLD has not challenged the authority of any of these entities to participate as a party in one or more of these consolidated appeals.

## III. Changes to the proposed development, surrounding area, and environs.

26. Sometime before December 21, 1993, the St. Albans Group (JLD Properties' predecessor-in-interest to the project site) and Wal-Mart Stores, Inc., applied for an Act 250 land use permit to build a Wal-Mart discount retail store in the same location in St. Albans Town that is now owned by JLD Properties.

27. On December 21, 1993, the District Commission issued Act 250 Land Use Permit #6F0471, authorizing the then-applicants, the St. Albans Group and Wal-Mart Stores, Inc., to build a 126,090-square-foot discount retail store.

28. In January 1994, several interested parties appealed the District Commission's determination to the Environmental Board and requested that the Board grant them party status on several Act 250 criteria, all of which are identified in 10 V.S.A. § 6086. The then-applicants contested the grant of party status to these appellants. The Board granted party status to the appellants with respect to certain Act 250 criteria, and the appeal proceeded relative to criteria 1(A), 1(B), 1(E), 1(G), 4, 5, 6, 7, 9(A), 9(H), 9(K), and 10. The interested parties requested that the Board reconsider its decision denying them party status with respect to certain other criteria, but the Board did not alter its decision. During the appeal, the then-applicants amended the size of the proposed store, reducing it to 100,000 square feet.

11

49

29. On December 23, 1994, the Environmental Board overturned the District Commission's issuance of an Act 250 permit. After concluding that the then-applicants had failed to meet the requirements of Act 250 criteria 6 and 7 (impacts upon educational and municipal services); 9(A) (impact upon town and regional growth patterns), and 9(H) (costs of scattered development), the Environmental Board denied the permit application.[8]

30. The then-applicants asked the Environmental Board to alter its determination. This request was denied, and the Environmental Board issued its final determinations on June 27, 1995. See In re St. Albans Group and Wal*Mart Stores, Inc., No. 6F0471-EB, Findings of Fact, Conclusions of Law, & Order (Altered) (Vt. Envtl. Bd. June 27, 1995), available at http://www.nrb.state.vt.us/lup/decisions/1995/6f0471-eb-fco-alt.pdf [hereinafter "1995 Env. Bd. Decision"]. This determination also concluded that the then-applicants had failed to meet their initial burden of production under criteria 6, 7, 9(A), and 9(H). See id. at 43–53.

31. The then-applicants appealed the 1995 Env. Bd. Decision to the Vermont Supreme Court, which upheld the Environmental Board's denial of an Act 250 permit. See In re Wal*Mart Stores, Inc. and The St. Albans Group, 167 Vt. 75 (1997).

32. The Wal-Mart store that JLD currently proposes is larger than that proposed in 1993 by a factor of nearly 1.5; its ability to generate greater gross retail receipts and economic activity was minimally discussed during trial but did not appear disputed.

33. Other changes to the physical characteristics have been included in the proposed project, including acquisition of easements needed for access to a highway bypass loop road (part of the highway bypass has been constructed); more extensive traffic improvements and mitigation measures; more extensive landscaping; and more extensive measures to address stormwater runoff.

34. The potential adverse economic impacts from the 1993 proposed Wal-Mart have been affected, not so much by changes to the proposed development, but rather by changes that have occurred within the surrounding area, its economic characteristics, and the taxing and regulatory mechanisms affecting this proposed development, including the following:

   a. The former Environmental Board concluded that the Wal-Mart development proposed in 1993 would likely cause an increase in the number of area school-aged children, thereby increasing the cost of educational services beyond the net increase in tax revenues that the project would generate. The Board also noted

---

[8] VNRC appropriately refers to these four criteria or sub-criteria as the Act 250 economic criteria.

that, at that time, the student population in the area schools was at the capacity of area educational facilities, and that the additional school children that the Wal-Mart development was likely to contribute would likely "exacerbate an existing adverse condition" within the school system, and therefore rendered negative findings under Act 250 criterion 6. 1995 Env. Bd. Decision at 51–52.

The twenty-five years since the Environmental Board's first decision has shown that school enrollment in Vermont, including in St. Albans Town and the adjoining municipalities, peaked around the time of the first Wal-Mart application. The predicted increase in students, particularly that which would require new school bonding and construction, has not occurred. In fact, school enrollment has dropped by two to eight percent in area public schools. Further, the mechanism for funding public education has changed significantly since 1993. With the enactment of Act 60, educational funding is no longer based exclusively upon the strength (and weakness) of a local grand list, but rather upon a complex formula administered by the State that (thankfully) we are not required to detail in these proceedings. One undisputed potential of the current state education funding formula is that an increase in students in the magnitude of what the currently proposed Wal-Mart would generate could actually contribute to a reduction in local educational tax rates, due to a resulting decrease in per-pupil school spending at the local school level.

b. The Board also concluded in 1993 that negative findings under Act 250 criterion 7 were required because the Wal-Mart developers had not provided a sufficient basis for the Board to determine that the proposed project would not create an unreasonable burden on the ability of local governments to provide municipal services. Id. at 53.

In support of its current application, JLD submitted from both the Town and City confirmations of the municipalities' ability to serve the anticipated needs that the proposed development will bring to these communities. No contradictory evidence was offered at trial. JLD's economic experts also provided convincing evidence that the proposed project could, at worst, contribute to a minor net increase in municipal tax assessments and, at best, contribute to a minor net decrease in municipal tax assessments. While VNRC's experts provided some reasonable criticisms of JLD's expert assessments and the mechanisms they employed, the criticisms were not sufficient enough to invalidate the municipal tax projections in support of the project.

c. The Board also ruled that the 1993 Wal-Mart proposal would significantly and negatively impact the Town's, City's, and region's potential financial capacity to accommodate total and expected rates of growth under Act 250 criterion 9(A). In so ruling, the Board noted that while the area near the project site included some commercial development, many open spaces in the area remained and none of what development had thus far occurred was of the aggregate size and magnitude of the then-proposed Wal-Mart. Further, the Board concluded that the proposed Wal-Mart would likely contribute to the costs that arise for a community when scattered development is allowed, thereby failing to conform to criterion 9(H). Lastly, the Board concluded that the proposed Wal-Mart would likely cause other

13

adverse economic impacts by contributing to the demise of several competing discount shopping centers that then existed in the area, including Ames, Woolworths, and Ben Franklin department stores.

Since 1993, the area near the project site has seen considerable changes and development expansions, even in the absence of the proposed Wal-Mart. The Town has extended its municipal water supply and wastewater treatment systems past the project site and nearly to its boundary line with the Town of Swanton. In accordance with the growth center designation adopted by the Town, and a separate growth center designation by the Northwest Regional Planning Commission, much of the commercial development that had only been proposed when the Board rendered its 1994 and 1995 decisions have been completed. Several large commercial centers now exist along the one-mile stretch of U.S. Route 7 between the border with the City and the project site; several larger commercial enterprises have also been established along Route 207 between the project site and the Exit 20 entrance and exit ramps to Interstate 89.

Included in this conglomeration of commercial developments within a mile-and-a-half radius of the proposed project site are fifty-one new commercial enterprises or developments, identified on JLD Exhibits 3 and 4. Many of these commercial enterprises or developments, including fast-food restaurants, bank branch offices, automotive sales, service and supply stores, and large retailers, such as Price Chopper, Hannaford, Tractor Supply, and Total Home Center, represent the secondary growth that the Board in 1993 was concerned that Wal-Mart, if allowed, would foster. Such growth, secondary or not, has already occurred, despite Wal-Mart's absence in the region.

35.    To the extent that the proposed Wal-Mart project could contribute to adverse economic impacts to the City, as an adjoining municipality, those adverse economic impacts have been minimized or negated by the economic payments and investments JLD has pledged to make to the City.

36.    JLD Properties has also proposed to increase its investment in improvements to area roads and highways, which have also undergone separate improvements and expansions since the original Wal-Mart was proposed for the project site in 1993. Those improvements are discussed in more detail below in the factual findings on traffic impacts.

## VI.    Additional economic impacts of the current proposed project.

37.    JLD provided convincing expert testimony as to the economic impacts the proposed development will generate. The best current estimate is that the operational Wal-Mart will generate a total of 225 additional jobs to the region, some part-time, others full-time positions. The best estimate of additional annual gross payroll generated by the proposed project is $1.1

14

million during the construction phase of the project and up to $8 million per year by the tenth year of operation.

38. While there was anecdotal evidence from other locations of job losses, failure of competing businesses due to a Wal-Mart opening, and increased economic pressures upon towns due to the secondary growth that a Wal-Mart can generate, there was little convincing evidence that such adversities will be caused by this Wal-Mart development, as currently proposed. The most convincing support for these conclusions derives from circumstances that now exist in the area, including that:

a) competing discount stores no longer exist in the area; their absence causes consumers to travel to Burlington and other retail areas outside Franklin County;

b) the proportion of retail sales per capita in Franklin County has decreased far below the per capita rates for the state and adjoining Chittenden County, as well as the per capita rates for retail sales that existed in this region in 1993; and

c) what secondary growth that was once feared for this area in 1993, if Wal-Mart was developed, has largely occurred in its absence.

39. The additional part-time and full-time jobs generated by the operation of the proposed Wal-Mart will likely result in forty-eight new residents for Franklin County, an estimate that was reliably determined by JLD's experts when comparing national baseline population growth figures to compatible census figures for the Town, the City, and the adjoining Town of Swanton. About eight of these projected new residents will be school-aged children. The educational needs of these new school children will not exceed the current capacity of area schools, even without the once-expected school bonding and construction, due to the atrophy of the area school-age populations over the last fifteen years.

## V. Traffic impacts.

40. As noted above, the proposed Wal-Mart is to be located within zoning districts designated for commercial and light industrial uses, and within growth areas designated by the Town and Regional Planning Commission; a nearby section of the Town of Swanton has also been designated as a growth center. These designations do not appear to have been made in the abstract; commercial development existed in this area when the District Commission reviewed the prior Wal-Mart application in 1993; commercial activity has significantly increased since that time and has brought with it a significant increase in all forms of traffic.

15

41. U.S. Route 7 is a frequently used and sometimes congested thoroughfare, particularly as it travels from the downtown section of the City, through the commercial developments of the Town commercial districts, and up to the project site. This highway generally consists of two travel lanes; as the highway travels from the City downtown section, numerous side street intersections are encountered, particularly within the brief residential section above the downtown area. As the highway transitions to the Town commercial districts, traffic flow increases and is assisted by dedicated turn lanes (including the resultant widening of the highway), signalization, and traffic islands. Some of these highway improvements have been added since 1993.

42. As noted above, the project site is located just north of the junction between Route 7 and Vermont Route 207; Exit 20 to Interstate 89 may be accessed about 1,000 feet to the east of this junction, along Route 207. Both Route 7 and Route 207 are identified by VTrans as rural highways that provide access to commercial developments.

43. A highway bypass loop access road has been proposed and partially constructed, but has not yet been completed. JLD proposes to construct an internal access road that would allow connection to this proposed highway bypass loop access road and has secured the easements necessary to provide this access. JLD has rejected suggestions that it provide additional contributions to the cost of the highway bypass and to other public highway improvements.

44. JLD proposes a single, signalized curb cut on Route 7 for its four-lot commercial subdivision. Lots 1 and 2 are not presently proposed for development in any of the pending applications, other than the access roads that run through them. However, if development is authorized for those lots in future land use applications, highway access is expected to be restricted to the single curb cut JLD now proposes. Lot 4 is proposed to remain otherwise undeveloped.

45. JLD has also proposed a loop road within its property to provide access between the individual lots and access to and from adjacent developments to the north and south. This design component will afford some relief for traffic between Wal-Mart and other adjacent commercial developments that would otherwise be required to enter and exit via Route 7.

46. JLD provided credible expert opinion testimony upon the estimated traffic that the proposed Wal-Mart would generate, both in terms of "primary" traffic (i.e., traffic with the

16

primary purpose of going to and traveling from the proposed Wal-Mart) and "bypass" traffic (i.e., traffic with Wal-Mart as an intermediate destination).

47. JLD's expert assessed the traffic impact from the proposed project, using generally accepted methods of traffic analysis, including those adopted and recommended by VTrans. These methodologies include an assessment of the "level of service" ("LOS") a highway intersection enjoys, with a LOS A representing the slightest delay at a highway intersection (under five seconds), a LOS F representing an unacceptable delay (over sixty seconds), and incremental differences in between LOS A and LOS F.

48. The area highway intersections experience on average a LOS C, which is customary for Vermont highways that travel through rural areas with commercial development.

49. The traffic that the proposed Wal-Mart generates will be spread out over its operational hours. However, the project will have the most impact on area traffic during the time when the area roads are already experiencing heavy traffic, particularly when that "peak hour" of existing traffic coincides with the greatest amount of new traffic generated by the proposed project.[9] This potential collision can result in the greatest impact upon area highway traffic.

50. The most credible estimate of the proposed project's traffic impact is that it is likely to generate 778 vehicle trips during the peak hour of weekday afternoon/evening traffic.[10] Of this estimate of peak-hour weekday afternoon/evening trips, 20% (about 156 trips) are estimated to be derived from existing Route 7 traffic, thereby leaving about 622 new trips during the weekday afternoon/evening peak hour generated by the proposed Wal-Mart.

51. JLD and its expert concede that this level of new trip generation will have an adverse impact upon area highways. Further complicating the area traffic concerns is a general agreement that other area commercial developments (including Franklin Park West, Price Chopper, Highgate Commons, and Franklin Business Park), as well as the potential development

---

[9] "Peak hour" is a term of art in the field of traffic analysis. We understand it to refer to the specific hour during an entire week, month, or year that experiences the highest level of traffic. Some suggest that to rely only upon "peak hour" estimates of traffic in designing highways would result in the highways being unreasonably expansive, since their design would be based upon accommodating the absolute highest level of traffic. Traffic experts therefore often refer, as did Mr. Dickinson, to the "design hour" when determining an appropriate reference for proposed highway improvements. The "design hour" is the hour in which the 30th highest level of estimated traffic occurs.

[10] In actuality, the only estimate of traffic impacts was that provided by JLD's expert, Roger J. Dickinson. His report was admitted into evidence as JLD Exhibit 23; his pre-filed testimony was admitted as JLD Exhibit 23A. VNRC's expert offered reasonable critiques and criticisms of the traffic testimony and other evidence offered on behalf of JLD, but it was not sufficient enough to discount the persuasive import of the JLD traffic evidence.

of Lots 1 and 2 within the JLD commercial subdivision, will all contribute additional traffic to area highways.

52.    To provide a reasonable basis for designing future mitigation measures, JLD's traffic expert used a 144% factoring of the estimated design-hour traffic generated by the proposed Wal-Mart. This design level of peak-hour traffic totals about 1,243 vehicle trips.

53.    Based upon this design estimate of project area traffic impacts, JLD proposes to fund and cause the construction of the following improvements and mitigation measures on area highways:

a.  Signalizing the proposed U.S. 7/Wal-Mart access intersection with new and exclusive left- and right-turn lanes on U.S. 7. The new traffic signal will be interconnected with the existing signals at the VT 207, Highgate Commons, and Price Chopper/Franklin Park West intersections so as to provide coordinated operation.

b.  Signalizing and widening of the VT 207/I-89 Exit 20 northbound off-ramp to include separate right- and left-turn lanes on the off-ramp.

c.  At the U.S. 7/VT 207 intersection, constructing a second southbound left-turn lane for vehicles turning from U.S. 7 onto VT 207 and a second westbound left-turn lane for vehicles turning from VT 207 onto U.S. 7 south. The latter will also include a second southbound through lane extending from this intersection south to a point approximately 500 feet south of the Price Chopper intersection.

d.  At the U.S. 7/Highgate Commons intersection, widening U.S. 7 from Highgate Commons north to the right-turn slip ramp leading to VT 207 in order to provide two northbound departure lanes, converting the existing northbound right-turn lane entering Highgate Commons to a through lane, constructing a new right-turn lane for northbound traffic entering Highgate Commons, and adding a second southbound through lane as described above. The center median in U.S. 7 north of the Highgate Commons intersection will also be modified to increase the southbound left-turn storage length for traffic entering Highgate Commons.

e.  At the U.S. 7/Franklin Park West/Price Chopper intersection, widening the northbound U.S. 7 approach to increase the queue storage length for the proposed northbound through/right-turn lane to 300 feet.

f.  Signalizing the U.S. 7/VT 105 approach intersection and constructing a new southbound left-turn lane and a new westbound right-turn lane.

g.  Modifying the existing traffic signal at Upper/Lower Newton Street to provide protected plus permitted[11] left-turn phasing (advance green) on the Lower Newton Street approach, revising the lane markings to optimize lane widths, replacing the

---

[11] These are terms of art in traffic analysis: "protected" refers to a dedicated travel lane for turning; "permitted" refers only to the legality of turning left from a through traffic lane.

18

existing pedestrian signals and installing vehicle detector loops to provide vehicle actuation.

h. Replacing the existing traffic signal controller(s) at the Lake Street and Fairfield Street intersections in downtown St. Albans City, upgrading the existing pedestrian signals and installing vehicle detector loops to provide vehicle actuation.

54. With these highway improvements and traffic mitigation measures, the traffic on area highways will not likely degrade below the current level of service, and may actually be improved, even in light of the traffic that the proposed Wal-Mart and other area developments will generate, including the traffic Wal-Mart generates during the peak traffic hours.

55. Convincing evidence was offered on behalf of VNRC, VTrans, and Commons of additional highway improvements and traffic mitigation measures that could help maintain or further improve area highway traffic, particularly if the improvements JLD proposes do not sufficiently mitigate the traffic impacts of the proposed Wal-Mart. These improvements include additional sidewalks for pedestrian traffic and additional travel lanes for bicycle traffic; further highway improvements could include additional travel lanes at intersections along Routes 7 and 207, and double "tear drop" roundabouts at the I-89/VT 207 interchange. Just this latter highway improvement could cost in excess of $2 million. The Court is uncertain whether these additional improvements will be needed and whether, if constructed, they will alleviate highway congestion caused by Wal-Mart.

56. Analysis of the traffic impacts from the proposed Wal-Mart can become complicated when considering not only the existing traffic, but also the additional traffic that could be generated by developments that are proposed and permitted, but not yet constructed and in operation.

57. In addition to the commercial development that has actually occurred along Routes 7 and 207, other large commercial developments are proposed for the area, each of which will generate vehicle trips along area highways. Two such proposed developments are (1) Franklin Park West, which borders on Route 7, and (2) the Franklin Business Park, which has access from Route 207. Neither site has undergone the actual development and build-out that was first envisioned when proposed.

58. JLD's traffic analysis includes reasonable estimates of the increased traffic that may be generated by these nearby developments over the next five years. Estimates of future traffic

generated by these nearby developments need not be included in JLD's traffic calculations, due to two undisputed facts: first, neither Franklin Park West nor the Franklin Business Park have experienced the rates of development first anticipated; and second, any incremental development in either of these business parks requires prior permit approval from the District Commission, thereby vesting the District Commission with the authority to review the estimated new traffic that the new business park development may generate and determine whether the approval of such individual developments should be conditioned upon additional traffic mitigation measures.

## VI.     Impact upon prime agricultural soils.

59.     The parties do not dispute that JLD's property contains prime agricultural soils. If the proposed Wal-Mart is built, it will impact approximately forty-four acres of prime agricultural soils on the project site. By impact, we mean here that these prime agricultural soils will be disturbed by the proposed construction and thereafter dedicated to hosting the building, parking lots, interior roads, and related improvements on the project site.

60.     The use of these soils for agricultural purposes has been less than successful. JLD has made their land available for agricultural use, but has not encountered a farmer willing to pay more than $1,500 per year to use the agricultural soils on the site. As a point of reference, this yearly agricultural income represents less than five percent of the annual real estate taxes for the project site (fiscal year 2008 taxes for the entire 107± acres were $35,393).

61.     Several area agricultural operations are located within several miles of the project site, although no agricultural operations are adjacent to or are likely to be adversely impacted by the proposed project. The closest agricultural operation is the Hudak Farm, located in the adjacent Town of Swanton, about one third of a mile from the Wal-Mart project site. The Hudak Farm and the project site are separated by Stevens Brook. The Hudak Farm is located in a different municipal zoning district: the Rural/Agricultural Zoning District.

62.     The Hudak Farm is a family-owned and -run agricultural operation, consisting of agricultural production, a greenhouse/nursery, and retail operations for agricultural produce, plants, and other goods.

63.     JLD does not own or control lands containing nonagricultural or secondary agricultural soils in the Town, City, or elsewhere in Franklin County. Neither JLD nor any other parties to this proceeding have identified another site that would be suitable for this proposed project, particularly a site that did not contain agricultural soils.

20

64. Separate from the other Act 250 proceedings mentioned above, the St. Albans Group (JLD's predecessor) also requested Act 250 approval to subdivide the same project site now owned by JLD. JLD is the successor-in-interest to the St. Albans Group. This subdivision application was filed pursuant to the then-existing Environmental Board Rule 21, which allowed applicants to apply for partial review under the relevant Act 250 criteria for a proposed subdivision or development.

65. On January 31, 2002, the District Commission issued its Findings of Fact, Conclusions of Law and Order in regards to the St. Albans Group's subdivision application requesting partial affirmative findings, including the proposed subdivision's impact upon primary agricultural soils. A copy of this District Commission determination was admitted into evidence as JLD Exhibit 27 and is hereinafter referred to as the "2002 District Commission Decision."

66. The District Commission specifically determined in 2002 that a subdivision of the project site, containing a lot identical to the Lot 3 JLD now proposes to develop, would directly impact forty acres of prime agricultural soils and "will effectively remove all 58 acres [of prime agricultural soils on the project site] from agricultural production." 2002 District Commission Decision at 4, ¶ 17. The District Commission concluded that the prime agricultural soils on the project site included "Massena Stony Loan, Georgia Stony Loam and Georgia Extremely Stony Loam." Id. at ¶ 16.

67. The St. Albans Group conceded that its proposed subdivision and eventual development of the project site would remove prime agricultural soils from effective production. In light of this conceded impact, and in order to secure positive findings for its proposed subdivision and eventual development, the St. Albans Group agreed to make payments to the Vermont Housing and Conservation Board ("VHCB") based upon a formula established by VHCB, which is based upon a multiplier derived from current agricultural land values in Franklin County. Id. at 5, ¶ 23. Such agreements are often referred to as "agricultural mitigation agreements."

68. A specific component of the agricultural mitigation agreement proposed by the St. Albans Group was that VHCB would use the paid funds on eligible agricultural projects within the District Commission's jurisdictional area. As successor-in-interest to the project and its project site, JLD has affirmed its commitment to this agricultural mitigation agreement.

69. Under the current formula, JLD would pay $167,622.50 to VHCB due to the loss of the on-site prime agricultural soils. VHCB would have the authority to use these funds for eligible

21

agricultural projects, including authority to purchase development rights and conservation restrictions on area farms.

70. The District Commission reviewed the then-existing procedures for approving an agricultural mitigation agreement that would allow for the District Commission to conclude that the cumulative net consequences were that the proposed subdivision or development could satisfy the then-existing provisions of Act 250 criterion 9(B), codified in 10 V.S.A. § 6086(a)(9)(B).

71. The District Commission concluded that, with the applicant's commitment to make the calculated payments to VHCB pursuant to the parties' agricultural-mitigation agreement, the proposed subdivision would not "result in any [net] reduction in the agricultural potential of [identified] primary agricultural soils," as directed by 10 V.S.A. § 6086(a)(9)(B).

72. The District Commission concluded its 2002 Decision with a directive that the "foregoing Partial Findings of Fact and Conclusions of Law are valid for three years, unless extended." Id. at 9.

73. In December 2004, prior to the filing of the currently pending Act 250 application, JLD's agent filed a request with the District Commission for an extension of the 2002 approval of the agricultural mitigation agreement.

74. As noted above, the area adjacent and near the project site has experienced increased commercial use, most significantly since 1993. The area has been designated as a commercial growth center by the Town and the Regional Commission; a nearby area in Swanton has been designated as a growth area as well. The area has not, however, been designated by the State as a commercial growth area.

## VII.  A Wal-Mart "Super Store": is it to be, or not to be?

75. In the parlance of Wal-Mart advocates and adversaries, a Wal-Mart "Super Store" is a term used to identify a specific type of large, multi-dimensional Wal-Mart that includes the discount retail store envisioned in the pending applications, but also includes, under the same roof, a full grocery store, gasoline or service station, and perhaps other components. While JLD concedes that the discount retail store it proposes for St. Albans is a large Wal-Mart, including as much square footage as some of its "Super Stores," it has repeatedly professed that this facility is not intended to be a grocery store, and will not include a gasoline or service station.

22

76. JLD has never proposed including such retail services in the proposed facility. It acknowledges that, even if it receives the requested land use approvals, it would have no authority to conduct such activities within this proposed Wal-Mart. JLD acknowledges that if its applications are approved, and if it later desired to expand the goods and services offered in this Wal-Mart, it could only do so after securing all necessary permit amendments.

77. Commons, as the owner of nearby commercial developments in which grocery stores and gas stations operate, expresses two credible concerns: first, that if, in fact, the proposed Wal-Mart was authorized to operate as a "Super Store" such that it included a full grocery store operation, it would be directly competing with the Commons' grocery store and other nearby grocery stores, and may thereby foster the negative economic impact once feared by the Environmental Board. Second, Commons expresses concerns that if a "Super Store" is allowed to operate at the project site, the adverse traffic impacts caused by it will be increased.

78. JLD concedes that it has not introduced any evidence of what impacts (economic or otherwise) its development would generate if it were to host a Wal-Mart Super Store that included a full grocery store component.

79. There is no evidence in the record, including JLD's application materials, that would allow for the operation of a Wal-Mart expanded beyond its conventional discount store theme. While it is acknowledged that a conventional Wal-Mart store offers for sale several of the same items as a conventional grocery store, these similarities do not qualify the proposed Wal-Mart as a "Super Store" or one that directly competes with grocery stores, such as the nearby Price Chopper and Hannaford grocery stores.

80. The Wal-Mart store proposed here would sell some retail items commonly offered for sale in grocery stores, supermarkets, or gas stations. JLD's representations are that the proposed St. Albans Wal-Mart would sell similar grocery store items as found in most other conventional Wal-Mart discount stores, including the nearest Wal-Mart in Williston, Vermont. Beyond this current reference point, JLD was unwilling to provide a more specific limitation on its proposed operation, at least in regards to the future sale of items commonly found in grocery stores.

81. The parties offered varying measures to determine the extent to which the proposed Wal-Mart could be limited in use, such that it would not directly compete with area grocery stores or supermarkets, in a manner that was not applied for or analyzed in these proceedings. JLD's

23

suggestion lacked specificity; the suggestion offered by Commons appeared verbose and difficult to apply in future practice.

82.    The evidence presented suggested that neither the proposed Wal-Mart nor the existing operation in Williston devotes more than 10,000 square feet of floor space (including isle space) to food items (i.e., _not_ including paper goods, cleaning items, and other non-edible items commonly available for purchase in both grocery and discount stores).

## Discussion

We now turn to an analysis of the remaining legal issues in the pending appeals. Those issues include some recurring procedural disputes, including those that are raised in post-trial motions filed on behalf of JLD and VNRC. We address those procedural issues first, since the outcome reached could determine whether we may proceed with our review of the pending applications.

**I.    Remaining Procedural Disputes.**

**a.  Are the pending applications barred by the successive application doctrine?**

The trial in these consolidated appeals provided the Court with the opportunity to resolve the dispute over material facts that prohibited this Court from determining via pretrial summary judgment the legal question of whether the pending JLD applications are barred by the doctrine of improper successive applications. The legal standard for determining whether a successive application should be barred remains the same as recited in this Court's March 16, 2009 Decision: when a prior application for a similar development has been denied, whether in the context of local or state land use regulation, a proponent of a successive, similar project must show "a substantial change in the application or the circumstances" surrounding the current project. In re JLD Properties – Wal-Mart St. Albans, Nos. 116-6-08 Vtec, 92-5-07 Vtec, and 242-10-06 Vtec, slip op. at 14 (Vt. Envtl. Ct. Mar. 16, 2009) (Durkin, J.) (quoting In re Armitage, 2006 VT 113, ¶ 8, 181 Vt. 241)

Our analysis is aided by the prior permit denial, since the factual basis for that denial often reveals the shortcomings of the prior project. But the changes presented by the current applicant must be substantial, and not merely a better presentation of evidence that was or could have been presented in support of the failed application. Such a rehashing of the failed permit proceedings is akin to the relitigation that is barred by the general doctrine of claims preclusion. Id. at 13–14 (citing In re Dunkin Donuts, 2008 VT 139, ¶¶ 9–10).

The successive-application doctrine represents a deviation from the general concepts barring relitigation, in recognition of the uniqueness of land use litigation. In matters such as these consolidated appeals, the legal questions address future impacts, such as economic and traffic impacts, and not events that occurred in the past, as is often the subject matter of other civil litigation.

An applicant who suffers a denial of its land development application is foreclosed from reintroducing an identical project. Dunkin Donuts, 2008 VT 139, ¶¶ 9–10. But an applicant may revise its land development proposal, particularly to address the shortcomings of its prior project, and may present evidence in support of its revised project that includes a showing that the circumstances surrounding it or the applicable regulatory provisions have materially changed since the first proposed project was denied approval.

This deviation from the general concepts barring relitigation is sometimes referred to as the balance between "flexibility and finality." Id. at ¶ 9. It originated within the context of Act 250 proceedings, In re Stowe Club Highlands, 166 Vt. 33, 38 (1996), but was later confirmed as an appropriate analysis in the context of municipal zoning proceedings. In re Hildebrand, 2007 VT 5, ¶¶ 12–13, 181 Vt. 568.

Within the context of the pending consolidated appeals, we conclude that JLD has presented sufficient evidence to establish that there have been substantial changes to its proposed development, the circumstances within the host and surrounding communities, and the applicable regulatory provisions that allow the pending applications to go forward. To conclude otherwise would constitute an unduly inflexible legal doctrine that once a proposed development was denied, no other could be proposed for that project site. The precedents established by our Supreme Court in Stowe Highlands and Hildebrand support such flexibility and caution against an unduly and draconian adherence to finality when there has been an adequate showing of changed circumstances.

As noted in our Findings above at Section III (p. 11–14), the most reliable evidence reveals that none of the factors that led to the denial of the Wal-Mart development proposed in 1993 are likely to exist as a consequence of the Wal-Mart that JLD now proposes some fifteen years later. Concerns about traffic and stormwater runoff have been addressed by changes in the

25

proposed project.[12] The Town has experienced substantial growth in these commercial zoning districts, including the very commercial growth that it was feared Wal-Mart would spawn.

This revelation does not support a conclusion that the former Environmental Board erred in 1994 and 1995 when it concluded that the then-proposed Wal-Mart was likely to cause adverse economic impacts under Act 250 criteria 6, 7, 9(A), and 9(H). Rather, it supports our conclusion that the development currently proposed, and the environment in which it will be situated, is substantially different from that which existed in 1994. The Town and the region have seen a significant expansion in commercial development, all in the absence of a Wal-Mart development. In fact, the Town has embraced and encouraged this significant expansion of commercial development, and has supported this commercial development in this specific area of Town, by extending its water supply and wastewater sewer lines up to and past the project site. The Town and the Regional Planning Commission have designated the surrounding area as a commercial growth center; a nearby section of the Town of Swanton has been designated as a commercial growth center as well.

Interestingly, there was little evidence presented at trial that the growth that has occurred along the two mile stretch of U.S. Route 7 from the downtown section of the City and past the project site has brought the adverse economic impacts feared in 1994. One such impact that has occurred actually now speaks in support of approving the proposed Wal-Mart: namely, the past fear that the then-proposed Wal-Mart would cause competing discount stores in the area to close, thereby decreasing competition and removing a valued jobs source. Those discount stores, including the Ames, Woolworths, and Ben Franklin department stores, closed without nearby competition from a Wal-Mart. Some might suggest that the demise of these competing discount stores was assisted by the national prominence of Wal-Mart and the presence of a Wal-Mart in Williston a number of miles away. While this speculation exists, the reality is that the St. Albans region is not currently served by a local discount retail establishment. While many more retail stores have come into the region, especially along Routes 7 and 207, the persuasive evidence is that per capita retail spending in the St. Albans region has declined significantly since 1994 and is currently well below estimated retail spending in nearby Chittenden County. The

---

[12] The former Environmental Board did not rely upon potential adverse impacts of stormwater runoff as a basis for denying the project in 1994. However, increased concerns about the adverse impacts of stormwater runoff from the project site threatened to doom JLD's application in these current proceedings. Thus, JLD made revisions to its treatment of stormwater runoff so as to avoid that potential basis for permit denial.

circumstances have changed such that consumers travel out of the St. Albans area to do a measurable amount of their discount store shopping. In fact, no such store exists in the region. The current circumstances evidence that commercial growth is now encouraged for this area and that the proposed Wal-Mart will fill a void that now exists in the local discount retail market.

Lastly, the current circumstances reveal that the proposed Wal-Mart will not likely bring about the adverse impacts upon area schools and school children that the former Environmental Board concluded were likely to occur in 1994. The City is also unlikely to suffer the adverse economic impacts once feared from Wal-Mart, due to JLD's commitment to mitigate those possible impacts with its payments to the City and investments in its downtown region. There was also undisputed evidence presented that the available municipal services now have the capacity to serve the municipal-service needs that the proposed Wal-Mart is likely to require.

The area schools no longer face the capacity problems presented fifteen years ago. The cost to educate a child continues to be high and continues to be the source of much debate during local and state budget sessions. This debate has been further fueled by the frequent reality that the annual cost of a child's education usually amounts to much more than the real estate taxes assessed upon the individual homes or developments. However, after 1994, the State changed the manner in which taxes are raised to fund education, thereby alleviating to some degree the pressures upon local communities to be the sole source for most education funding. The most reliable estimates presented show that the currently proposed Wal-Mart is unlikely to cause more than a minor increase in local taxes, and has some potential to actually cause a minor decrease in local tax rates, due to local cost savings realized by a lowering of the cost-per-student ratio that is a variable in the state education funding formula.

Thus, there has been a significant change in the circumstances that led to the denial of the prior Wal-Mart development proposal, due to a likelihood of adverse economic impacts under Act 250 criteria 6, 7, 9(A), and 9(H). In light of these changed circumstances, we conclude that JLD's proposed development is sufficiently different than the development first proposed in 1993, both in terms of its characteristics and the circumstances surrounding it, such that this subsequent application is not barred by the doctrine of improper successive applications.

### b. Do the identified appellants have standing to prosecute these appeals?

In its post-trial motion to dismiss, JLD Properties asserts that VNRC, the owners of the Hudak Farm, their co-appellants in the various appeals (JLD collectively refers to these entities

and individuals as the "Appellants"), and R.L. Vallee lack standing to prosecute these various appeals and therefore should be dismissed as parties in these proceedings. In support of its dismissal motion, JLD asserts that these Appellants and R.L. Vallee failed to present evidence at trial to show that they hold the necessary particularized interests to fulfill the minimal constitutional standards for standing in litigation. Although not specifically expressed, we understand that JLD's post-trial motion is made with the intention of convincing the Court to disregard the evidence presented on behalf of these Appellants, dismiss their appeals, and render judgment in JLD's favor based upon these important procedural requirements.

JLD properly notes that a party wishing to appeal an Act 250 or state agency permit determination must either be a "party by right" or a "person aggrieved by an act or decision" they seek to appeal. 10 V.S.A. § 8504(a).[13] A similar provision—10 V.S.A. § 8504(b)—notes that a party who wishes to appeal a municipal zoning or planning determination must have "participated" in the prior proceedings and have fulfilled one or more of the qualifications to be deemed an "interested person" under 24 V.S.A. § 4465. These statutory requirements codify the constitutional limitation upon courts to only entertain "actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction." In re Marcelino Waste Facility, No. 44-2-07 Vtec, slip op. at 4 (Vt. Envtl. Ct. Mar. 21, 2008) (Durkin, J.) (quoting Parker v. Town of Milton, 169 Vt. 74, 77 (1999)).

The Appellants and R.L. Vallee take exception to JLD's challenge on both procedural and substantive grounds. Both grounds provide a basis for denial of JLD's dismissal motion.

Our prior Marcelino decision contains controlling precedent in regards to the constitutional limitations upon courts, and the parties that appear before courts, as expressed in Parker, but contains little further precedent applicable to the state and local land use applications now before us. In Marcelino, the appellant challenged an Act 250 district coordinator's jurisdictional opinion that the Marcelino Waste Facility did not need to obtain an Act 250 permit. This facility was previously known as the Burlington Landfill; its operation pre-dated the adoption of Act 250. No party status or standing determinations had been made in the proceedings that preceded the Marcelino appeal.

Under 10 V.S.A. § 6007(c), "any person" may request a jurisdictional opinion from an Act 250 district coordinator. However, the right to appeal a jurisdictional determination to this

---

[13] 10 V.S.A. § 8504(d) contains further limitations on a party wishing to appeal an Act 250 determination.

Court is limited under 10 V.S.A. §8504(a) to "persons aggrieved," as defined in 10 V.S.A. § 8502(7). Marcelino Waste Facility, No. 44-2-07 Vtec, slip op. at 4. Thus, in jurisdictional proceedings such as Marcelino, the first time a party status or standing determination is considered is on appeal.

In Act 250 application proceedings, such as the applications on appeal here in Docket Nos. 80-4-08 Vtec and 116-6-08 Vtec, party status determinations are first made by the district commission. Any party aggrieved by a party status determination may appeal to this Court. 10 V.S.A. § 8504(a). Thereafter, a party status determination made by a district commission affords that party "automatic" party status in a subsequent appeal to this Court, unless that status is changed on this Court's own motion or that of an opposing party. V.R.E.C.P. 5(d)(2).

The Rules governing environmental court proceedings have been established "to ensure summary and expedited proceedings consistent with a full and fair determination in every matter." V.R.E.C.P. 1. In the spirit of this directive, our Rules direct that the Court conduct an initial conference "as soon as possible" after an appeal is filed. V.R.E.C.P. 2(d)(1). At that conference, the Rules direct that the parties and the Court "shall" consider a number of procedural issues, including issues relating to party status. V.R.E.C.P. 2(d)(2)(ii). This provision assists with the full, fair, and expedited processing of appeals directed by Rule 1.

In all of these proceedings, JLD chose not to appeal the party status determinations made below, and it did not raise its challenge to Appellants' standing at any stage in the pretrial process for each of these six consolidated appeals. We share VNRC's and R.L. Vallee's consternation at the need to address standing issues, in a complex litigation such as these six consolidated appeals, for the first time well after the close of evidence and trial. We find incredible the assertion that in this litigation, with all the vehicles of discovery available and actually used, a standing challenge could only reveal itself after trial is completed.

JLD properly notes that standing is not equivalent to party status. But JLD fails to properly identify the distinction between the two. As evidenced in the Marcelino proceedings, not all land use proceedings require an immediate determination of party status. But when a party status determination is made, particularly with its statutory prerequisites of "person aggrieved" and "particularized interest," that analysis is similar, perhaps identical, to an analysis of a party's standing to prosecute an appeal. Party status determinations were made in the Act 250 proceedings below, and JLD chose not to challenge those determinations here.

29

The Act 250 party status determinations made by the District Commission below and left unchallenged by JLD included determinations that all these Appellants have particularized interests that could be impacted by the proposed Wal-Mart development and that are addressable under the applicable provisions of Act 250 and the local subdivision and zoning bylaws.

R.L. Vallee is a commercial neighbor attempting to maintain a retail establishment that may not directly compete with the proposed Wal-Mart, but that will certainly be impacted by the traffic Wal-Mart generates. To the extent that JLD was not compelled, or did not offer to fund and construct the needed traffic mitigation measures, the impact upon R.L. Vallee and others similarly situated would be greater, perhaps to such an extent as to exacerbate an already congested traffic environment.

Prior to trial, it appeared undisputed that R.L. Vallee and other Appellants similarly situated could suffer adverse impacts under all the regulatory criteria challenged in these appeals. JLD's current standing challenge seems to miss or ignore this point: that to fulfill a burden of proof in support of a party status and standing request, the requesting party need only show that the proposed project "could" have an adverse impact upon their particularized interests, and that the regulatory review would afford them some possible relief. Our analysis in the remainder of this Decision generally concludes that those adverse impacts are unlikely to result from the project JLD now proposes, but that conclusion has been arrived at only after the Appellants have caused JLD and its predecessor to reconsider and revise its proposed project. The project we approve today has secured that favorable result only after input from the Appellants here, encouraged by the potential for adverse impacts upon their particularized interests.

VNRC was perhaps the most visible party opponent in these proceedings, although that fact does not diminish the status and standing of the other Appellants. As a statewide not-for-profit organization with active members within the St. Albans region, VNRC has perhaps the greatest expertise and resources of its co-appellants, although its resources are dwarfed by an applicant such as a Wal-Mart proponent. But for VNRC's efforts to protect its particularized interests and those of its co-appellants, it is unlikely that the pending application would include the applicable revisions to stormwater treatment, traffic mitigation, and economic impact analysis that JLD presented at trial. VNRC's participation in these proceedings provided a solid foundation for its standing and resulted in an approved project that is unlikely to cause the adverse impacts once feared.

30

Based upon this record, we conclude that JLD failed to timely raise its standing challenges. But we also conclude that the record before us, including the un-appealed portions of the local and state decisions below, contain an adequate foundation for our conclusion that the Appellants, including R.L. Vallee, have standing to prosecute these various appeals.

### c. Is it appropriate to impose the sanctions VNRC requests?

While we share VNRC's consternation concerning JLD's delay in challenging its standing, VNRC's request for sanctions brings about a bit of consternation as well, for while VNRC professes its angst, it provides the Court with no specific recommendations on the type of sanctions that would be appropriate to impose. An appropriate sanction to JLD's delay in raising its standing challenge would be to conclude that JLD had waived the right to raise such a challenge. Such a sanction appears supported, given the directive in Rule 2(d)(2)(ii) that issues concerning party status "shall" be raised at the initial conference. Given the length and complexity of this litigation, as well as the constitutional and jurisdictional implications of JLD's assertions, we have provided our analysis and conclusion as to why JLD's dismissal motion must be denied on substantive factual grounds as well. In that regard, we **GRANT** VNRC's sanctions request, on this limited basis.

### d. May and should the Court take judicial notice of prior Act 250 permits?

Courts are authorized to take judicial notice of "adjudicative facts," including facts that are "not subject to reasonable dispute." V.R.E. 201(a), (b). Usually, requests for a court to take judicial notice of some fact or document are made during trial or while the Court's receipt of evidence remains open. VNRC made such a request during the portion of the trial concerning traffic, and it has supplemented its judicial notice request with a formal motion, filed post trial. For the reasons detailed below, we **GRANT** VNRC's request.

VNRC requests that the Court take judicial notice of the applicable Act 250 "umbrella" permits issued for the nearby developments, known as Franklin Park West and Franklin Business Park. Copies of each permit are attached to VNRC's post-trial judicial notice request; the Act 250 umbrella permit for the Franklin Park West is Attachment A; the Act 250 umbrella permit for the Franklin Business Park is Attachment B. Both developments are located in St. Albans Town, on opposite sides of I-89, just south of the Exit 20 on- and off-ramps. These two developments are depicted on VNRC Exhibit F.

31

The Franklin Park West permit (Act 250 Permit #6F0357-R-1) authorized the subdivision of a tract of land behind and to the west of the Highgate Commons shopping complex, with an access road onto U.S. Route 7, just to the south of Highgate Commons. The Franklin Park West permit authorizes the subdivision of the land into twelve lots, with all but two of the lots proposed for commercial development. The permit also authorizes certain infrastructure improvements, including a 4,200-foot-long access road, water supply and wastewater disposal lines, a pump station, parking, landscaping, and electrical, telephone, and natural gas services. Permit #6F0357-R-1 was issued by the District Commission on November 18, 1992. At trial, there were non-specific references to the slow development progress of this business park. The Court's site visit to this development put those trial references in context.

The Franklin Business Park permit (Act 250 Permit #6F0396R-EB-1) authorized the subdivision of seventy-seven acres into ten lots to be used for industrial and light commercial uses. Access to the subdivided industrial and light commercial lots is from a 4,600-foot-long access road off of Route 207. This development is also to be served by town-supplied water and sewer services. The former Environmental Board issued this permit on January 29, 1992. General references were also provided at trial to the recent, but slow development in this business park.

Both permits are limited in scope, as they only authorize the subdivision and creation of industrial and commercial lots. Each permit specifically conditions the development of any of the individual lots upon receipt of an Act 250 permit amendment. Each permit references that the authorized subdivision will impact upon agricultural soils. The Franklin Park West permit specifically references a mitigation agreement, under which payments are to be made by the developer to the Vermont Housing Conservation Board whenever development occurs on the impacted lands.

Each permit speaks to an anticipated allocation of traffic generated from each park. These traffic allocations are general in nature; they are not allocated to the development of each lot and we understand that the Act 250 proceedings on the application for development of individual lots will review traffic impacts under criterion 5. The total peak-hour traffic trips referenced in each permit (1,294 peak-hour trips for the total Franklin Park West development and 665 peak-hour trips for the total Franklin Business Park development) are referenced as

maximums which, if exceeded within that development, could result in further traffic conditions being placed upon development of lots within that development.

Within the context of the testimony offered at trial concerning the Franklin Park West and Franklin Business Park developments, and in light of the fact that no party has disputed that the copies of each permit offered by VNRC are accurate, the Court concludes that it is appropriate to take judicial notice of the offered permits. We make reference to the applicable provisions of each permit in our following analysis of the remaining legal issues.

## II.    Remaining Act 250 Issues.

Before any Act 250 permit may issue, the district commission in the first instance, and this Court on appeal, must determine that there is a sufficient factual foundation to render positive findings under all applicable criteria and sub-criteria. 10 V.S.A. § 6086(a). When a project only impacts certain criteria, or when the parties reach consensus on a factual foundation for positive findings, the procedural rules governing Act 250 proceedings allow the district commission, and this Court, to limit its factual finding to "those criteria and sub-criteria at issue during the hearing." Former Environmental Board Rule 51(F) (2004).[14] We therefore limit both our Findings and legal analysis to the seven Act 250 criteria and sub-criteria that remained at issue when we commenced trial.

Through the parties' efforts, and the interim determinations that this Court has made on pretrial motions, a number of the Act 250 criteria originally challenged before the District Commission and later preserved for our review by the various appellants in their respective Statement of Questions have been resolved. In fact, the trial revealed the parties' consensus that there remained only four general areas of dispute under the following Act 250 criteria: (a) the potential economic impacts under criteria 6, 7, 9(A), and 9(H); (b) traffic impacts under criterion 5; (c) the impact and propriety of mitigation concerning prime agricultural soils under criterion 9(B); and (d) conformance with the Town and Regional Plans under criterion 10. We address each of those remaining issues in turn.

---

[14] Our reference is to the former Environmental Board Rules, as those were the Rules in effect when JLD filed its complete Act 250 application. The Rules currently in force are the Act 250 Rules, last amended on July 10, 2009. In reviewing both versions of Rule 51(F), they appear to be identical.

## a.  Economic impacts (Act 250 criteria 6, 7, 9(A), and 9(H)).

We have already addressed at some length the economic impacts of the proposed development, including the differences in those impacts and those that were anticipated from the Wal-Mart development first proposed in 1993. But we must complete a separate analysis here, for the question of whether there has been a "substantial change" from the prior project, and whether the new project conforms to the applicable criteria, are two separate legal issues, as we advised in one of our prior, pretrial decisions.  See In re JLD Properties – Wal-Mart St. Albans, Nos. 116-6-08 Vtec, 92-5-07 Vtec, and 242-10-06 Vtec, slip op. at 14 (Vt. Envtl. Ct. Mar. 16, 2009) (Durkin, J.) (quoting In re Armitage, 2006 VT 113, ¶ 8, 181 Vt. 241).  Thus, we now seek to provide notice of our determinations under the specific economic criteria that remain challenged in these consolidated appeals.

Before the granting of any Act 250 permit, determinations must be made under Act 250 criteria 6 and 7 concerning whether the proposed project will "place an unreasonable burden on the ability of [local governments] to provide educational[, municipal, or governmental] services." 10 V.S.A. § 6086(a)(6), (7).  Due to the factual findings we have rendered here, supplemented by the additional analysis below, we conclude that JLD's proposed Wal-Mart development satisfies Act 250 criteria 6 and 7.

As noted above, all of the fears expressed fifteen years ago that a proposed Wal-Mart would unreasonably impact upon area governments to provide educational services have been negated by changes in the capacity of area schools to accommodate additional school children and revisions in the manner in which educational funding is raised through local and state taxing schemes.  In fact, the increase in school-aged children that the proposed Wal-Mart development is likely to generate may actually contribute to a reduction in the per-pupil cost of providing educational services to area children.  We conclude that the proposed development will not cause an unreasonable burden upon the ability of any affected municipality to provide educational services.   We therefore conclude that the proposed development complies with Act 250 criterion 6.

There was little dispute as these appeals progressed through trial that the Town has the capacity to provide the municipal and governmental services that the proposed development is likely to require.  The Fiscal Impact Study offered in support of the proposed development provided the most credible foundation for our determination under criterion 7; it predicts that the

34

fiscal impacts of the proposed Wal-Mart will be minimal and, in a worst-case scenario, will cause no more than a minimal increase in the net cost of municipal services. Further, JLD has pledged that, "if the cost of municipal services such as fire, police, and ambulance that are attributable to the Wal-Mart store and are substantiated by the Town, exceed the amount of taxes being paid" by or on behalf of the development, JLD would "cover these additional costs of services." Particularly with such a pledge, which we will direct to be incorporated into any permit that may issue, we find no basis for concluding that the proposed development is likely to cause unreasonable impacts upon the ability of local governments to provide municipal and governmental services. We therefore conclude that the project, as currently proposed and conditioned, complies with Act 250 criterion 7.

We take up a combined analysis of the next two economic impact criteria, Act 250 criteria 9(A) and (H), concerning the project's impact upon growth and its contribution to the costs of scattered development, since both topics are related, particularly in connection with this proposed development and the circumstances surrounding its project site.

The proposed project is situated in an area that both the Town and Regional Planning Commission have designated as commercial growth areas. The site itself is located in commercial and industrial/light commercial zoning districts. The adjacent and nearby areas along U.S. Route 7 and Vermont Route 207 have seen significant and varied retail and commercial expansion; the Town has encouraged this expansion with its extension of town water supply and wastewater disposal systems, including to a point beyond the Wal-Mart project site and nearly to the boundary with the Town of Swanton. In fact, Swanton has also designated a nearby area as an additional commercial growth center. Due to the commercial development along Routes 7 and 207, including the slow but planned development of the nearby commercial developments at Franklin Park West and Franklin Business Park, we are left to wonder where this commercial development is to occur, if not at this specific project site.

Within the context of the directives from criterion 9(A), the local communities have planned for and expect this type of commercial development in this specific area. Thus, the proposed development is unlikely to cause an "undue burden upon the town and region in accommodating growth caused by the proposed development," thereby negating the need for additional impact conditions under this criterion. 10 V.S.A. § 6086(a)(9)(A).

The irony experienced in this region is that many examples of the secondary and other growth that gave rise in 1994 to concerns under criteria 9(A) and (H) have occurred in the absence of this Wal-Mart development. We received little evidence that the actual commercial growth in this area has caused the undue burdens upon area communities that gave rise to reasonable concerns nearly sixteen years ago, when a Wal-Mart discount store for this region first came under review. Thus, the experiences from the actual commercial developments, and the fact that such developments now exists and have been supported and encouraged in this area, have provided additional foundation for our legal conclusions under these economic criteria.

As directed by 10 V.S.A. § 6086(a)(9)(A), we have taken into consideration the population growth experienced in this region and that which has been planned for or anticipated in the region, and have concluded that the proposed project will not significantly affect either the total growth or rate of growth which may flow as a consequence of the approval of this project. As noted above, we have made factual determinations on the anticipated costs of education and other municipal services, including area highways and access to those highways, water supply and wastewater disposal services, police and fire services, and other factors relating to the public health, safety, and welfare. We conclude that no such factors will be unreasonably impacted and none support a negative conclusion under Act 250 criterion 9(A).

Similarly, we conclude that, while this proposed Wal-Mart development is not located within or adjacent to an established settlement or downtown region, any public service or facilities costs caused by the proposed development will be offset by the tax revenue the project generates, the contributions JLD has pledged to make to the City, and the project's other public benefits. We therefore conclude that the proposed project is unlikely to contribute additional costs to the region, due to the extension of development that has and is planned to already occur outside of the existing settlement and downtown regions, and therefore complies with Act 250 criterion 9(H).

To interpret 10 V.S.A. § 6086(a)(9)(H) as prohibiting all development that is "scattered" or located outside an established settlement area would be error. This project provides an example of the type of development that criterion 9(H) allows: while outside an established area, preexisting commercial development near the project site helps reduce the public costs that this project alone will cause. In fact, it appears undisputed that the Town and the region have designated this specific area for commercial development. In doing so, the local communities

36

have planned for this type of development, thereby avoiding the unplanned and unintended costs that often follow scattered development.

There is a remaining legal issue to resolve concerning the potential economic impacts of the proposed Wal-Mart: the concerns expressed by Commons that some limitation on grocery and gasoline sales should be imposed upon JLD, given that no evidence has been presented concerning the impact that could result, should the proposed Wal-Mart offer direct competition to area grocery or supermarket stores and gasoline stations. JLD opposes such a condition, asserting that it has never requested approval to have its proposed Wal-Mart directly compete with nearby grocery stores, supermarkets, and gasoline stations.

Commons appeared during trial to discard its request for a condition restricting gasoline sales, since no suggestion has been made that such sales will occur at this proposed Wal-Mart. However, Commons' concerns persist, since JLD concedes that the proposed Wal-Mart will offer for sale a number of items, including some food items that are commonly offered for sale in grocery stores and supermarkets. The parties endeavored after trial to come to an agreement on language that would appease Commons' concerns without unduly restricting JLD's ability to operate a conventional Wal-Mart discount store on the project site. The parties' efforts at an agreement failed, so the Court is left to determine what additional language, if any, should be used to condition JLD's operation of the proposed Wal-Mart store.

Given the circumstances surrounding this issue, we first conclude that additional conditional language is warranted so that the operation of the proposed Wal-Mart does not morph into a store—whether or not it is a "Super Store" Wal-Mart—that provides direct competition with area grocery stores or supermarkets. Unlike the discount stores that once existed in the area but are now gone, this area contains a number of grocery stores and supermarkets, including those in the adjoining commercial developments such as Price Chopper and Hannaford. These establishments are part of the established commercial fabric of this region and offer employment to a number of area residents. We cannot determine what impact, if any, a grocery sales operation within the proposed Wal-Mart would bring because we have received no evidence in that regard.

JLD is understandably hesitant to suggest limits on its retail operations. It pledges that its discount store would be operated in a fashion similar to the existing Wal-Mart operation in Williston. However, JLD's representation provides a basis for a permit condition that appears

37

even less workable than that offered by Commons. The Court cannot imagine adjudicating a claimed violation under either suggested permit condition, particularly since such a dispute would likely occur many years after this Decision, when no party will have a clear recollection of what the Williston Wal-Mart once offered for sale in 2009.

Therefore, based upon the evidence presented as to both the current operation of the existing Williston Wal-Mart and the Wal-Mart JLD proposes in these proceedings, we conclude that the following additional condition is warranted:

> The proposed Wal-Mart discount store shall not devote more than 10,000 square feet of floor space (including isle space) to the sale of food items (i.e., not including paper goods, cleaning items, and other non-edible items commonly available for purchase in both grocery and discount stores) without first submitting an application for amendment to its Act 250 permit, and receiving a permit amendment that authorizes the sale of such food items in an aggregate area greater than 10,000 square feet in its Wal-Mart discount store.

## b. Traffic (criterion 5).

Under this Act 250 criterion, we are presented with the legal question of whether the proposed development will "cause unreasonable congestion or unsafe conditions with respect to use of the highways . . . and other means of transportation existing or proposed" in the affected areas. 10 V.S.A. § 6086(a)(5). Under this criterion, if we are inclined to conclude that the project will have such unreasonable traffic impacts, we are directed not to deny the permit, but to attach "reasonable conditions and requirements . . . to alleviate the burden created." 10 V.S.A. § 6087. In light of the factual determinations rendered in this Decision concerning traffic, and for the additional reasons noted below, we conclude that with the appropriate conditions, the proposed Wal-Mart will comply with Act 250 criterion 5.

This project will contribute significant additional traffic to the affected area highways; this fact is not disputed. JLD recognizes this impact, and has pledged to fund and cause significant improvements and mitigation measures at area highway intersections. VNRC, Commons, and, to a far less extent, VTrans, recommend that JLD be required to do additional highway improvements. We are more inclined to rely upon the traffic improvement recommendations offered by JLD's expert, with two caveats.

This trial reinforced the general notion that traffic analysis, predictions, and recommendations are to a significant degree a scientific exercise, but also include a bit of estimation and artistic license. The traffic estimations and recommendations from JLD's expert

38

appear sound, well reasoned, and sufficient to withstand the thorough attacks from VNRC's experts and attorneys, but JLD's estimates can by no means be taken as an absolute guarantee of the traffic volumes that this proposed project will generate. Those estimates include the prediction that, once in operation, the proposed Wal-Mart will generate 778 vehicle trips during the peak hour of weekday afternoon/evening traffic, which would represent the time at which Wal-Mart traffic will have the greatest impact. Based upon these estimates, and after factoring in estimated additional traffic, JLD's expert recommended certain improvements to area highways, all of which are listed above at Finding ¶ 53(a)–(h).

We conclude that, with these highway improvements, the traffic impacts generated by the proposed Wal-Mart will comply with Act 250 criterion 5. However, our conclusion here is premised upon the traffic Wal-Mart generates not exceeding the peak-hour estimates. Therefore, so as to assure that the traffic impacts do not become unreasonable, we add the following additional condition:

> Jurisdiction under criterion 5 is to be retained by the District Commission so that it may confirm that the actual traffic generated does not exceed JLD's estimates of traffic from the project site (i.e., 778 weekly peak-hour trips), and to confirm that the traffic improvements JLD agrees to complete actually offset the congestion caused by the increased traffic Wal-Mart generates. To aid the Commission in making these future determinations, JLD, its successors and assigns are directed to cause a count of actual traffic during peak weekday hours during the fifth operational year of the project, and to report such traffic counts to the District Commission, VTrans, Commons, and VNRC. The District Commission shall have the authority to reopen these proceedings upon the six year anniversary of the opening of the proposed Wal-Mart, during which it may consider the traffic counts reported by JLD, other evidence from individuals granted party status by the Commission, and impose such additional conditions, if any, as may assure conformance with 10 V.S.A. § 6086(a)(5).

We noted above that there were two caveats; the second concerns the consideration of pedestrian and bicycle traffic, what impacts (if any) the proposed Wal-Mart will generate, and what impact the Wal-Mart traffic will have upon existing or future pedestrian and bicycle traffic. Wal-Mart proposes to include internal access roads and sidewalks on its project site; pedestrians and bicyclists may use these access ways. However, Wal-Mart suggests that no additional sidewalks or other improvements are needed beyond its project site for pedestrians or bicyclists because there was little evidence of pedestrians or bicyclists using the existing area highways. While there was little evidence of such usage, and no specific evidence that the vehicular traffic

39

Wal-Mart generates will unreasonably impact upon pedestrians and bicyclists, we are left to wonder what the actual usage may be once the proposed Wal-Mart becomes operational. Therefore, we direct that the District Commission may also analyze the impact upon pedestrians and bicyclists, if and when it decides, in its discretion, to reopen its analysis of the project under criterion 5.

Lastly, we note that VNRC offered a thorough critique of JLD's traffic analysis, including a specific criticism of the project's traffic expert's decision to not factor into his most recent report and analysis all the traffic allocations for the two significant nearby commercial/industrial developments: Franklin Park West and Franklin Business Park. We note that not all development on the individual commercial and industrial lots within these subdivisions have been authorized by the District Commission. The referenced Act 250 permits are for the subdivisions only. Appropriately described by VNRC's counsel as "umbrella permits," the 1992 Act 250 permits set maximums for estimated traffic, above which the Commission may direct those project developers to implement further traffic improvements or mitigation measures. Further, in the proceedings to determine if an Act 250 permit should be issued for commercial or industrial development on each individual lot, the Commission may impose additional traffic conditions upon the development of that specific lot. 10 V.S.A. § 6087(b).

The parties concede that development at the Franklin Park West and Franklin Business Park has been slow to materialize. We decline to follow VNRC's recommendation that the additional future traffic generated by all possible future development at these parks should be taken into consideration by JLD, given that the future development in these parks is not yet permitted, may only occur at some undetermined point in the future, and that the District Commission may impose additional traffic improvement conditions upon such future development, if and whenever it actually occurs.

### c. Prime agricultural soils (criterion 9(B)).

Our analysis under this criterion contains two sections because JLD requests positive findings by way of two options: first, that it is entitled to an extension of positive findings secured by its predecessor during a 2002 Act 250 subdivision proceeding, during which the District Commission rendered positive findings under criterion 9(B); second, JLD asserts that while its project will impact prime agricultural soils, its plan to mitigate those impacts and the

character of those soils warrants positive findings under criterion 9(B). Due to the applicable findings above, and in light of the additional reasons below, we conclude that the proposed project conforms to Act 250 criterion 9(B).

We first believe it appropriate to put the affected agricultural soils in context. There appears to be no dispute that the JLD project site contains 107± acres, about 58± acres of which contain identified prime agricultural soils. Unfortunately, the prime agricultural soils exist in the front and middle of the lot. Therefore, in order to gain access to the non-agricultural soils for development, any access road would have to travel through the agricultural soils.

The site sits within the commercial and commercial/light industrial zoning districts, in an area also designated as a commercial growth area by the Town and the Regional Planning Commission. Over the last fifteen years, this area has seen significant additional commercial development. No evidence was offered at trial that the area has seen an addition of any agricultural uses being established in the area, either on this project site or on nearby properties. Establishment of an agricultural operation on this project site seems impossible, since no farmer has offered more than $1,500 in annual rent for use of the agricultural soils, which represents only four percent of the annual real estate taxes of over $35,000.

While there are several agricultural operations in St. Albans Town and nearby Swanton, none are adjacent to the project site. The nearest such operation, the Hudak Farm, is about one third of a mile away, in the adjacent Town of Swanton, but is also separated from the project site by Stevens Brook and a multitude of commercial developments, including the Champlain Commons strip development, several auto sales and service establishments, and the preexisting drive-in theater.

The District Commission determined in 2002 that a subdivision, which contained a lot identical to the Lot 3 that JLD now seeks to develop, would impact the same prime agricultural soils and "will effectively remove all 58 acres [of prime agricultural soils on the project site] from agricultural production." 2002 District Commission Decision at 4, ¶ 17. As a consequence of that impact, JLD's predecessor proposed a mitigation plan by which it agreed to make payments to the Vermont Housing and Conservation Board ("VHCB") based upon a formula established by VHCB, which is based upon a multiple of current agricultural land values in Franklin County. Id. at 5, ¶ 23. The District Commission concluded that, with this agricultural mitigation agreement, the proposed development of this lot, while effectively removing these

41

soils from agricultural production, was in conformance with criterion 9(B). The Commission made its Findings of Fact valid "for a period of three years, unless extended." Id. at 9.

A request to extend the 2002 positive Findings of Fact under criterion 9(B) was timely filed on JLD's behalf in December 2004. The District Coordinator deferred an immediate ruling on this extension request until the District Commission could render a decision on JLD's application for full Act 250 approval of its proposed Wal-Mart project. When the District Commission issued its Findings of Fact, Conclusions of Law, Order and Permit on April 4, 2008, it approved JLD's request for an extension of the positive findings under Act 250 criterion 9(B). See 2002 District Commission Decision at 52.

With the benefit of hindsight, the three-year limitation upon the validity of this factual finding appears far too short, particularly in light of the voluminous opposition the proposed Wal-Mart has attracted and the multi-layered litigation the current proceedings have undergone, which includes both successful and unsuccessful claims of conflicts of interest as well as repeated discussions, both before this Court and the District Commission, that the successive-application doctrine applies to the pending state and local land use applications. JLD asserts that these litigation efforts and changes in market conditions, not delays on its part, prevented development within the three-year timeline that that Commission established in 2002. For these reasons, we **GRANT** the requested extension of the Commission's prior positive findings under criterion 9(B), and direct that its validity coincide with the term of the positive findings that we have issued here.

VNRC objects to both JLD's extension request and suggestion that the project as currently proposed conforms to criterion 9(B). VNRC's first objection is premised upon the undisputed procedural fact that our legislature amended 10 V.S.A. § 6086(a)(9)(B), so as to limit the use of agricultural mitigation agreements in areas that the state has specifically designated as growth areas. JLD concedes that the state has yet to designate the area of its project site as a growth area, even though the Town and the Regional Planning Commission have already made such a designation.

State and local land use regulations and statutes are subject to change, and such change often occurs. It is for this reason that our jurisprudence recognizes a vested right that an applicant may employ when it has submitted a complete application prior to a change in the applicable law. See In re Jolley Assocs., 2006 VT 132, ¶ 11, 181 Vt. 190 (citing Smith v.

42

<u>Winhall Planning Comm'n</u>, 140 Vt. 178, 181–82 (1981)). VNRC's argument here appears to disregard the concept of an applicant's vested rights in this instance, or asserts that vested rights should not be recognized when an extension request is under consideration. We disagree on both counts, as we have found no legal precedent for disregarding the right that has vested in JLD to have its application considered under the prior version of 10 V.S.A. § 6086(a)(9)(B); this right also has some persuasive effect on our determination to extend the validity of the District Commission's positive findings under Act 250 criterion 9(B). That persuasive import comes from the underlying rationale of the vested-rights doctrine, which is premised upon a desire in land use litigation to avoid "extended litigation" and "protracted maneuvering." <u>Smith</u>, 140 Vt. at 182.

We have already concluded that extension is appropriate here. However, given the extensive litigation that has occurred, we believe it appropriate to reinforce the Commission's prior positive findings and conclusions with our own analysis. To do so, we rely upon the version of 10 V.S.A. § 6086(a)(9)(B) that was in effect when JLD filed its complete application on December 21, 2005. That statutory version provided that, since JLD concedes that its project will reduce primary agricultural soils, it may only be granted an Act 250 permit if the evidence supports the following factual findings:

> (i) JLD can only realize a reasonable rate of return on its land by devoting the primary agricultural soils to uses that will significantly reduce their agricultural potential;

> (ii) JLD does not own or control lands, other than those containing primary agricultural soils, upon which it may plan its development;

> (iii) the proposed development has been planned to "minimize the reduction of agricultural potential [of the identified soils] by providing for reasonable population densities, reasonable rates of growth, and the use of cluster planning and new community planning designed to economize on the cost of roads, utilities and land usage"; and

> (iv) the proposed development "will not significantly interfere with or jeopardize the continuation of agriculture or forestry on adjoining lands or reduce their agricultural or forestry potential."

10 V.S.A. § 6086(a)(9)(B) (2005).

Given that the undisputed evidence is that the agricultural use of the project site fails to generate income that provides for even four percent of the municipal taxes levied upon the parcel, subsection (i) is satisfied. JLD also presented uncontested evidence that it does not own a

43

parcel of land, not containing agricultural soils, upon which a project such as this could be located. In fact, the evidence failed to reveal any other site in Franklin County upon which such a project could be located. Thus, subsection (ii) is satisfied as well.

As to subsection (iii), JLD has acknowledged that its project will eliminate the agricultural potential of the identified soils and has assumed the financial responsibility of preserving a multiple of similar prime agricultural soils by entering into a mitigation agreement with the VHCB, which has committed to using the JLD funds to preserving agricultural soils elsewhere in the region.

No residential development is proposed for the project site and therefore population densities on site are not an issue. The proposed Wal-Mart will encourage individuals to relocate to the region for work. We have addressed the capacity of the region to absorb school-aged children in our analysis under Act 250 criterion 6 and the impact upon growth rates in our analysis under criterion 9(A). JLD has designed its project to include interior roads that will help the flow of traffic between commercial developments, and has committed to fund and construct highway improvements that will mitigate its project's impact upon area roads.

Lastly under subsection (iii), we note the vigorous disagreement between JLD and VNRC concerning whether the proposed project represents "clustered planning." It is difficult to associate such a term with a development that encompasses one large building. However, we conclude that, within the context of the commercial growth zone in which this development is situated, a Wal-Mart discount store, including one as large as proposed here, brings a multitude of retail sales under one roof, thereby bringing together in one building a variety of retail items that a consumer would otherwise be required to travel to several area stores to acquire. Clustered development is more often ascribed to residential developments. See In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec (Vt. Envtl. Ct. Mar. 27, 2008), aff'd 2009 VT 98. However, we further conclude that the proposed Wal-Mart represents a commercial development that adequately brings together and thereby clusters a variety of retail items for sale to the general public.

Under the final subsection, 10 V.S.A. § 6086(a)(9)(B)(iv) (2005), we first conclude that there are no agricultural soils on lands that adjoin this project site. The area nearby this site includes much commercial development. Some of the adjacent lands are forested, thereby providing a natural buffer within this commercial district; lands on the site along Stevens Brook

44

will remain undeveloped. The site is located in commercial/industrial zoning districts and within an area designated by the Town and the Regional Planning Commission as a commercial growth area. While there are some lands in the region that remain devoted to agricultural production and activities, none are within a close enough range to be impacted by this proposed project.

The nearest agricultural lands are those at the Hudak Farm, but these lands are about a third of a mile away, separated from the project site by Stevens Brook and the multitude of commercial developments. See JLD Exhibit 3. Hudak Farm is located in a different zoning district in the adjoining Town of Swanton. While the proposed Wal-Mart project will bring to the region a use and development quite different from the Hudak Farm, we cannot conclude that the project's proximity to Hudak Farm (although not adjacency) will cause the project to violate 10 V.S.A. § 6086(a)(9)(B)(iv).

For these reasons, we conclude that the proposed project conforms to Act 250 criterion 9(B).

### d. Conformance with Town and Regional Plans (criterion 10).

Criterion 10 often suffers from being the last legal issue reviewed in an Act 250 proceeding, and that is regrettable, for it can be the most significant. This criterion directs that the proposed project must conform to "any duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). The Town duly adopted a Town Plan in 2005; a copy was admitted into evidence as JLD Exhibit 34. A copy of the duly adopted Regional Plan was admitted into evidence as JLD Exhibit 35. Both Plans represent the community-adopted hopes and expectations for how their area should grow and maintain the land use characteristics they most cherish.

Such hopes and expectations are often stated in town and regional plans in broad policy statements and goals, which can provide guidance of what types of development, in what locations, a community wishes to encourage. However, such broad policy statements cannot be relied upon to specifically restrict certain types of development in certain locations; only language that "is clear and unqualified, and creates no ambiguity," can be read to create specific restrictions. In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520 (mem.) (quoting In re MBL Assocs., 166 Vt. 606, 607 (1997) (mem.)). Broad policy statements phrased as "nonregulatory abstractions" cannot be the basis for denial under Act 250 criterion 10, since they may not be given the legal force and effect of a regulatory requirement, such as zoning laws. In re Molgano, 163 Vt. 25, 31 (1994).

45

Turning first to the Town Plan, we note that the Plan reinforces the Town's designation of the area in and surrounding the project site as a commercial growth area. The Town Plan notes that the Town has encouraged commercial growth in this area by the extension of water supply and wastewater treatment services up to and past the project site. The proposed project incorporates the Plan recommendations that planned growth be orderly and respect aesthetic concerns; the siting of the project puts the Wal-Mart facility 1,300 feet from the adjacent highway (U.S. Route 7) and lower in elevation than the front lots, so that this large building will be set back and partially obscured from the highway. The significance of this building will not be as distracting and aesthetically prominent as it could be, if sited in the front lots and directly upon the identified agricultural soils.

The design will remove from development approximately fifty-five acres in the rear of Lots 3 and 4 that adjoin Stevens Brook, thereby creating an extensive buffer along a waterway recognized as important in the Town Plan. Possible adverse impacts upon area highways (public investments under Act 250 9(K)) will be averted by the improvements and mitigation measures JLD has proposed, as well as the additional traffic condition this Court has imposed. As discussed above, to the extent it is later determined that the internal sidewalks and access ways that pedestrians and bicyclists may use need to be supplemented by off-site sidewalks and other improvements (a factor not supported by the current evidence), the District Commission will have the authority to require JLD to make such off-site improvements.

Lastly, the evidence supports our conclusion that the currently proposed Wal-Mart will not bring the loss of jobs and adverse economic impacts once feared; the likelihood of job gains and positive economic impacts are encouraged by the Town Plan.

The Regional Plan contains similar aspirational goals. It contains the encouragement of economic growth, which has been buttressed by the Regional Planning Commission's additional designation of this area as a growth center. Although a subcommittee of the Regional Planning Commission conducted a vigorous debate over the appropriateness of siting a Wal-Mart in this region, the full Commission adopted a resolution that the Wal-Mart JLD now proposes is in conformance with the Regional Plan.

JLD provided credible testimony and other evidence of how the proposed project conforms with the multiple, specific provisions in the Town and Regional Plan. VNRC sought an adverse finding under this criterion with a multitude of citations to portions of both Plans that

the project does not seem to support. However, with the directives of <u>Russell Corp.</u>, <u>MBL Assocs.</u>, and <u>Molgano</u> in mind, we conclude that because VNRC directs us to Plan provisions that are only aspirational and do not provide the firm and direct notice of regulatory language, such as directives as "shall not," "must," and "prohibited," we cannot base a determination of nonconformity on the Plan provisions cited by VNRC.

We have already addressed that this project will render the identified agricultural soils as no longer available for agricultural uses. JLD concedes this point and has committed to preserving agricultural soils through its mitigation agreement with VHCB. We have also concluded that a productive or viable use of these agricultural soils is very unlikely, perhaps impossible, given their location in a commercial growth center and the commercial uses of nearby properties. To focus upon the removal of these soils from possible agricultural use, as VNRC does, and the encouragement in both plans for the preservation of agricultural uses, ignores the realities of the commercial designation and development in this area. JLD's proposed project does not bring strip development to this area (a use discouraged, but not restricted, in the Town Plan); such development has already come to this area, in the absence of a Wal-Mart development. To say that the proposed Wal-Mart is out of scale and exceeds the region's commercial needs is to ignore the credible evidence presented of the expansion of commercial activities in this area, all the while experiencing a steep decline in retail sales that remain in the region, given that the three prior discount stores have decided to remove themselves from this market.

In sum, we conclude that the proposed project follows many of the aspirational goals expressed in both the Town and Regional Plans, and neither Plan contains specific, regulatory land use prohibitions that this project disregards. We therefore conclude that the project as proposed and modified by the conditions that will be incorporated into its Act 250 permit conforms to criterion 10.

As a consequence of our determinations here, coupled with the findings and conclusions not appealed, we conclude that the proposed project, as proposed and conditioned, is entitled to an Act 250 permit.

## III. Remaining Issues Concerning Municipal Permitting.

Docket Nos. 242-10-06 Vtec and 92-5-07 Vtec present us with remaining legal issues to be decided under the Town Subdivision and Zoning Bylaws ("Bylaws"). Many of the factual

determinations that relate to the remaining municipal regulatory issues have already been discussed in our analysis under Act 250. Our remaining factual references are therefore brief, but we endeavor to provide a complete review of the remaining municipal subdivision and zoning issues.

### a. Subdivision.

Subsequent to the Court's pretrial rulings and the parties' Stormwater Settlement Agreement, the issues remaining in the appeal by VNRC and its co-appellants of the DRB's approval of JLD's four-lot subdivision are contained in VNRC's Questions 4, 5, and 6 of its Statement of Questions in Docket No. 242-10-06 Vtec: (4) Is the proposed project compatible with adjacent uses and therefore compliant with Bylaws § 220.3? (5) Will the proposed project cause unreasonable congestion or unsafe conditions on the affected roads, or place an unreasonable burden on the Town to provide municipal and governmental services, and thereby not conform to Bylaws § 220.4? and (6) Does the proposed project fail to conform to the applicable provisions of the Town Plan and Bylaws, as well as the applicable Act 250 criteria, and thereby fail to conform to Bylaws § 220.5? We conclude that the proposed project conforms to each of these municipal subdivision criteria.

As we already announced in our analysis under Act 250 criterion 9(B), the proposed project conforms to the uses of adjacent and nearby properties, most all of which are of commercial varieties and contained within the commercial growth centers designated by the Town and the Regional Planning Commission. No adjoining property hosts agricultural uses; the nearest agricultural operation is the Hudak Farm, located one third of a mile away, in a separate zoning district in the Town of Swanton. The project is further separated from the Hudak Farm by Stevens Brook and partially separated by the fifty-five acre buffer along Stevens Brook that JLD has pledged will remain undeveloped. Many commercial developments line both sides of U.S. Route 7 as one travels from the project site to the Hudak Farm. The project conforms to Bylaws § 220.3.

This project will increase traffic to a significant degree, although the credible estimate is that it will not contribute more peak-hour trips than the nearby Franklin Park West commercial/industrial development, for which the District Commission has already issued subdivision approval. JLD has pledged to fund and construct significant highway improvements and traffic mitigation measures. The Court has imposed an additional condition that will provide

48

assurance that JLD's efforts will not cause unreasonable traffic congestion, and may actually improve traffic flow. The project conforms to Bylaws § 220.4.

Lastly, as we previously noted, the project is in harmony with the aspirational goals of the Town Plan, and does not conflict with any regulatory provisions in the Town Plan. We have not been made aware of any credible evidence that the project is in conflict with any other applicable Bylaw provisions and have found that it conforms to all applicable Act 250 criteria. The project conforms to Bylaws § 220.5.

We do not address the other procedural challenges VNRC raises that it asserts require rejection of JLD's subdivision application, since those challenges have already been addressed in the Court's pretrial decisions and entry orders. Thus, we conclude that JLD's municipal subdivision application must be **APPROVED**.

### b. Site plan, conditional use, and PUD approvals.

In this Docket, VNRC and its co-appellants' remaining issues are contained in Questions 5 and 7 of VNRC's Statement of Questions, which challenge the project's conformance with the site plan, conditional use, and PUD provisions of the Bylaws. Commons also filed an appeal to these municipal approvals, challenging the project's conformance with traffic standards, and raising the propriety of grocery store sales within the proposed Wal-Mart. We address each challenge in turn.

In our analysis, we rely upon the Bylaw provisions in effect at the time JLD filed its complete municipal application. See In re Jolley Assocs., 2006 VT 132, ¶ 11, 181 Vt. 190 (citing Smith v. Winhall Planning Comm'n, 140 Vt. 178, 181–82 (1981)). The fact that a prior version of the Bylaws provided different conditions for site plan approval, including front yard open space, has no bearing on our analysis. We are directed to review JLD's application pursuant to the amended Zoning Bylaws, since that version contains the provisions in effect at the time JLD filed its complete application for site plan and conditional use approvals. Id.

Bylaws § 303 governs site plan review; its subsections establish minimum requirement and information that must accompany a site plan application. All such information was contained within JLD's municipal application.

Bylaws § 305(3) governs conditional use approvals; it incorporates the standards directed by 24 V.S.A. § 4414(3)(A); the Bylaw directs that a conditional use shall not have a substantial and material adverse effect on:

A. The capacity of existing or planned community facilities;

B. Traffic on roads and highways in the vicinity;

C. The utilization of renewable energy resources;

D. The character of the area affected as defined by the purpose or purposes of the zoning district within which the project is located, and specifically stated policies and standards of the Town Plan; and

E. Other Town Bylaws and ordinances then in effect.

We have analyzed each of these criteria in our review of conformance with the applicable Act 250 criteria. We find that the proposed project will not have a substantial and material adverse impact upon any of these conditional use criteria. We therefore conclude that the JLD project is entitled to site plan and conditional use approval.

JLD suggests in its supplemental post-trial memorandum that the issue of whether JLD's project should receive PUD approval has not been adequately preserved for review in this appeal. We decline to adopt this argument. However, JLD argues in the alternative that PUD would only be made necessary if the Court determined that the prior zoning provisions applied, particularly in relation to a restriction on the percentage of a front yard that may be devoted to parking and driveways. The prior version of Bylaws § 303(4) required eighty percent of the area in front of a proposed building to be open space; the amended version of Bylaws § 303(4) reduces the open space requirement to as little as twenty percent by its allowance for commercial uses in a designated growth center to devote up to eighty percent of its front yard to parking and driveways. Id.

The JLD project is in a Town-designated growth center. Less than eighty percent of its front yard will be restricted to open space, particularly if the front lots (Lots 1 and 2) obtain land use approvals at some point in the future (approval for development of JLD Lots 1 and 2 is not sought in any of the pending applications). Thus, JLD conceded that if the former version of Bylaws § 303(4) applied, it could not conform to this site plan requirement and therefore sought to remedy this nonconformance by requesting PUD approval, by which it could be exempted from this site plan provision. Because we have concluded that JLD's application is governed by the amended version of Bylaws § 303(4), which requires no more than twenty percent of open space, JLD no longer needs PUD approval in order to conform to the applicable site plan requirements. We conclude that JLD's request for PUD approval is therefore moot.

50

Nonetheless, for the reasons already stated, we conclude that if JLD needed PUD approval to conform, it satisfies all the requirements for PUD approval. See Bylaws § 417, which incorporates by reference the requirements for a planned unit development found in 24 V.S.A. § 4417.

For all these reasons, we conclude that the Wal-Mart project that JLD proposes, with the conditions that we direct in this Decision, is entitled to site plan and conditional use approval. We deem JLD's request for PUD approval as moot, but note that for the reasons previously stated, the project conforms to the PUD requirements contained in the applicable version of the Bylaws and state statutes.

## Conclusion

In light of the Findings of Fact and Conclusions of Law that are included in this Decision on the Merits, we hereby Order as follows:

1. In regards to the appeal in Docket No. 116-6-08 Vtec, we hereby **AFFIRM** Act 250 Land Use Permit #6F0583, issued by the District #6 Environmental Commission on April 4, 2008, together with the alterations rendered by the District Commission pursuant to its Memorandum of Decision dated May 16, 2008, subject to the following modifications and additional conditions:

   a. Condition 11 is deleted in its entirety and replaced with the following:[15]:

   The Permittee shall perform an annual inspection for each of the first five years after final stabilization of the project site to ensure proper execution of the stormwater offset projects and to ensure site stabilization is complete and offset projects are functioning as designed. If it is determined by JLD or by parties in consultation with JLD that the offset projects are not functioning as designed, it shall be the responsibility of JLD to ensure that the offset projects are redesigned to meet the original offset goals.

   b. Condition 12 is deleted in its entirety.

   c. Condition 13 is deleted in its entirety and replaced with the following, which incorporates the parties' Stormwater Settlement Agreement, a copy of which shall be attached to any permit that issues: "JLD shall construct and maintain offset projects

---

[15] Conditions 11 and 12 of the original Act 250 permit are hereby deleted because the monitoring requirements of those original conditions are obviated by the offset measures JLD has agreed to implement pursuant to the parties' Stormwater Settlement Agreement, as noted in ¶ 6 on page 3 of such Agreement. A copy of that Agreement is attached to this Decision as Exhibit 2.

51

described in Appendixes 6-16 of the parties' Stormwater Settlement Agreement, a copy of which is attached hereto and made part hereof. Such offset projects are to be located within the Stevens Brook Watershed and are intended to help ensure that the project will not cause or contribute to a violation of the water quality standards."

d.  Conditions 30, 31, and 32 are deleted in their entirety.

e.  In replacement of the prior Conditions 30, 31, and 32, the following Conditions are to be added to the revised permit, thereby re-sequencing the numbers of such remaining Conditions and so as to incorporate JLD's agreement with the City of St. Albans:[16]

i.  If Substantial Construction (as hereinafter defined) first occurs before December 31, 2010, the Permittee shall pay the sum of $300,000 to the City within one week of such Substantial Construction and not later than one year thereafter shall pay an additional $100,000 to the City.

ii.  If Substantial Construction first occurs after December 31, 2010, but before December 31, 2011, the Permittee shall pay the sum of $250,000 to the City within one week of such Substantial Construction and not later than one year thereafter shall pay an additional $50,000 to the City.

iii.  The term 'Substantial Construction' as used herein means construction of the proposed Wal-Mart building improvements costing singly or in the aggregate at least $100,000.

iv.  JLD Properties shall purchase and renovate, in the Downtown Business District 1 in the City, at least four properties, with an aggregate purchase price of at least $1.5 million, and aggregate renovation investments of at least $1 million. JLD Properties shall seek to identify, acquire and renovate catalyst properties of significance based on their location on prominent streets, historic character, or potential to incent additional investment. At least one building shall be or shall have been purchased by June 30, 2009, with renovations to be completed within not more than a year thereafter. By each June 30 thereafter through June 30, 2012, JLD Properties will purchase at least one of the required additional buildings, with renovation of each such building to be completed not more than two years after its purchase; provided, however, that JLD Properties' obligation to proceed with the purchase and renovation of the final three buildings shall be contingent upon the occurrence of Substantial Construction, and if Substantial Construction has not occurred by June 30, 2010, the dates for the purchase of such three additional buildings, and for the completion of the required renovations, shall be extended by the number of days between June 30, 2010 and the date on which Substantial Construction first occurs.

---

[16]  A copy of JLD Properties agreement with the City is attached to this Decision as Exhibit 1.

v.   As part of its downtown development activities referenced in Paragraph 5 of the agreement between JLD Properties and the City of St. Albans, JLD Properties will also make the following payments to the City: $300,000 if paid in full by December 31, 2009; $350,000 if paid in full by December 31, 2010; and $400,000 if paid in full by December 31, 2011. $100,000 of the total shall be, or shall have been, paid to the City before December 31, 2008. The balance will be due only if Substantial Construction occurs. If Substantial Construction occurs, the balance of the mitigation fee will be due at JLD Properties' discretion but in any event not later than December 31, 2011, with the amount of such payment to be based on the schedule provided above (that is, an additional $200,000 if paid in full by December 31, 2009; an additional $250,000 if not paid in full until later than December 31, 2009 but not later than December 31, 2010; and an additional $300,000 if not paid in full until later than December 31, 2010 but not later than December 31, 2011). If Substantial Construction has not occurred by December 31, 2011, the outside date for payment of the amounts provided for in this Section 4 shall be extended by the number of days between December 31, 2011, and the date on which Substantial Construction first occurs. These payments are not refundable and shall be paid directly to the City of St. Albans, for use and application as the City sees fit.

vi.   If Substantial Construction occurs and JLD Properties fails to purchase and renovate at least four buildings as provided in Paragraph 5 above, JLD Properties shall pay the City liquidated damages at the rate of $200,000 per building not so purchased and renovated. For the avoidance of doubt, that means that if Substantial Construction occurs and JLD Properties does not purchase and renovate at least four buildings as provided in Paragraph 5, above, it will owe the City liquidated damages of (i) $200,000 multiplied by (ii) four minus the number of buildings so purchased and renovated.

vii.   JLD Properties will be a major development partner on the City's downtown core project. Any definitive agreement must be on terms satisfactory to the City and JLD Properties. In concept, JLD Properties would work with the City to explore options for making the downtown core project happen. Without limitation, JLD Properties' efforts may include brokerage, site planning and development. Contingent upon the occurrence of Substantial Construction, JLD Properties will make an initial contribution of $50,000 to the City's downtown core project not later than December 31, 2011.

viii.   The construction of a movie theater, any sporting goods store (such as a Dick's Sporting Goods store), or more than two restaurants as part of the development of the approximately 107 acre site on which the Project is located is prohibited."

f.   The following additional conditions shall be added to the revised Act 250 permit:

i.   Jurisdiction under criterion 5 is hereby retained in the District Commission so that it may confirm that the actual traffic generated does not exceed JLD's estimates of traffic from the project site (i.e., 778 weekly peak-hour

53

trips), and to confirm that the traffic improvements JLD agrees to complete actually offset the congestion caused by the increased traffic Wal-Mart generates. To aid the Commission in making these future determinations, JLD, its successors and assigns are directed to cause a count of actual traffic during peak weekday hours during the fifth operational year of the project, and to report such traffic counts to the District Commission, VTrans, Commons, and VNRC. The District Commission shall have the authority to reopen these proceedings upon the six year anniversary of the opening of the proposed Wal-Mart, during which it may consider the traffic counts reported by JLD, other evidence from individuals granted party status by the Commission, and impose such additional conditions, if any, as may assure conformance with 10 V.S.A. § 6086(a)(5). The District commission may also analyze the project's impact upon pedestrians and bicyclists, id and when it decides, in its discretion, to reopen its analysis of the project under criterion 5.

ii. JLD shall cause all highway intersection improvements and traffic mitigations measures summarized in ¶¶ 53(a)–(h) on page 18 of this Decision.

iii. The proposed Wal-Mart discount store shall not devote more than 10,000 square feet of retail floor space (including isle space) to the sale of food items (i.e., not including paper goods, cleaning items, and other non-edible items commonly available for purchase in both grocery and discount stores) without first submitting an application for amendment to its Act 250 permit, and receiving a permit amendment that authorizes the sale of such food items in an aggregate area greater than 10,000 square feet in its Wal-Mart discount store.

iv. If the Town substantiates that the costs of municipal services attributed to the operation of Wal-Mart store (such as fire, police, ambulance and similar municipal services), exceed the amount of taxes being paid by or on behalf of the development, the Town in its discretion may give notice of the additional costs it claims to the Wal-Mart owners and operators and may demand that such additional expenses shall be reimbursed. A dispute over such additional municipal services expenses shall first be presented to a neutral mediator for resolution, and thereafter be presented to the District Commission for resolution, subject to rights of appeal to this Court.

2. The appeal of the District Commission's original Land Use Permit #6F0583, dated April 4, 2008 (Docket No. 80-4-08 Vtec), is hereby **DISMISSED** as moot.

3. The site plan approval decision of the Town of St. Albans Development Review Board, dated April 26, 2007 (Docket No. 92-5-07 Vtec), is hereby **AFFIRMED**.

4. The conditional use approval decision of the Town of St. Albans Development Review Board, dated April 26, 2007 (Docket No. 92-5-07 Vtec), is hereby **AFFIRMED**.

5. The Town of St. Albans Development Review Board 4-Lot Subdivision approval decision, dated September 22, 2006 (Docket No. 242-10-06 Vtec), is hereby **AFFIRMED**.

6. The appeal of the Agency of Natural Resources Construction Discharge Permit #3655-INDC, dated Sept. 12, 2007, (Docket No. 221-10-07 Vtec) is hereby **DISMISSED** pursuant to the parties' Stormwater Settlement Agreement.

7. The appeal of the Agency of Natural Resources Stormwater Discharge Permit #3655-INDS, dated April 26, 2006, (Docket No. 129-5-06 Vtec) is hereby **DISMISSED** pursuant to the parties' Stormwater Settlement Agreement.

8. Each appeal is hereby **REMANDED** to the appropriate state or municipal body to complete any remaining acts associated with JLD's applications, including the issuance of the applicable Act 250, zoning and building permits to JLD for the construction of the Project as proposed and hereby conditioned. Each revised permit shall incorporate the provisions revised by this Decision, the provisions affirmed by this Decision, and the un-appealed provisions of each prior decision.

9. Each party is to bare its own costs; the Court hereby exercises its discretion by declining to award the reimbursement of costs to any party in this proceeding. See V.R.C.P. 54(d)(1).

This completes the current proceedings before this Court concerning these appeals. A Judgment Order accompanies this Decision.

Done at Newfane, Vermont this 20th day of January 2010.

_____
Thomas S. Durkin, Environmental

55

**EXHIBIT 2**

G4

# SETTLEMENT AGREEMENT

Settlement Agreement, dated June 5, 2009, among the Vermont Natural Resources Council (VNRC), the Northwest Citizens for Responsible Growth (NWCRG), Marie Frey, Richard Hudak, the Vermont Agency of Natural Resources (ANR), the Land Use Panel of the Vermont Natural Resources Board (LUP), the Water Resources Panel of the Vermont Natural Resources Board (WRP), the Town of St. Albans (St. Albans), and JLD Properties of St. Albans (JLD), collectively known as the parties.

Whereas, JLD applied for and was granted a site plan and conditional use approval and subdivision approval from the Town of St. Albans, an operational and NPDES construction stormwater permit from ANR, and an Act 250 Land Use Permit from the District Commission for the construction of a Wal-Mart store in St. Albans, Vermont ("the Project");

Whereas, the approvals and permits referenced above were appealed by VNRC, NWCRG and/or Marie Frey and Richard Hudak to Environmental Court;

Whereas ANR cross appealed the Act 250 permit;

Whereas, the appeals have been recorded by the Environmental Court under the Dockets, In re: JLD Properties of St. Albans, LLC Docket Nos. 129-5-06 Vtec; 242-10-06 Vtec; 92-5-07 Vtec; 221-10-07 Vtec; 80-4-08 Vtec; and 116-6-08 Vtec;

Whereas, the VNRC appeals referenced herein involve issues related to the impact of the proposed St. Albans Wal-Mart store on water quality related to the proposed discharge of stormwater from the operation and construction of the Project to Stevens Brook.

Whereas, the VNRC et al. appeals allege that it is a violation of Vermont water pollution control laws, the Clean Water Act, Act 250 criteria 1, 1(B), 4 and 10, and provisions of the Town of St. Albans Zoning and Subdivision Bylaws for the proposed Wal-Mart to discharge sediment and nutrients via stormwater from the construction and operation of the proposed Project to Stevens Brook because Stevens Brook is, in part, impaired by excessive nutrients and sediment and it has alleged that there is no assimilative capacity for additional loading of these pollutants to Stevens Brook;

Whereas, JLD, ANR, WRP, LUP and the Town disagree with VNRC and its position on appeal and although JLD believes that its Project will not cause or contribute to a violation of the Vermont Water Quality Standards or otherwise violate Vermont water pollution control laws, the Clean Water Act, Act 250 criteria 1, 1(BO, 4 and 10, or provisions of the Town of St. Albans Zoning and Subdivision Bylaws, JLD has agreed to construct and maintain offset projects within the Stevens Brook Watershed that will help ensure that the Project will not cause or contribute to a violation of the water quality standards;

Whereas, the parties agree that with the construction of the offsets described in the attached Appendixes, the Project will not increase the load of sediment to Stevens Brook and is estimated to result in a decrease of approximately three tons per year in the sediment load to Stevens Brook, based on the estimates and best professional judgment of ANR, JLD and VNRC;

Whereas, the offsets accomplish the intended purpose and potential remedy anticipated by Conditions 11-13 imposed upon JLD by the District Commission in the Act 250 permit, construction of the offsets therefore renders any potential offset requirement under Condition 13 satisfied and obviates the need for the monitoring requirements of Conditions 11-12 of the Act 250 permit;

Whereas all parties enter into this stipulation and agreement as a compromise and execution of this agreement does not constitute a waiver or admission of liability or concession on a position held during the litigation or on appeal;

Whereas, the parties agree that the stipulation, offset, issues raised in the appeal, the dismissal of the appeal, and resulting Order creates no precedent as to any future docket.

Now therefore in reliance on the representations above, the parties agree to the following:

1) JLD will complete (up to installing final stabilization) construction of all of the offset projects as described in Appendixes A-K of this arrangement prior to commencing construction of the proposed St. Albans Wal-Mart.

2) JLD will agree to perform an annual inspection for five years beginning the year after final stabilization to ensure proper execution of the offset projects and to ensure stabilization is complete and offset projects are functioning as designed.

3) If it is determined by JLD or by parties in consultation with JLD that the offset projects are not functioning as designed, it shall be the responsibility of JLD to ensure that the offset projects are redesigned to meet the original offset goals.

4) The obligations of JLD under this Settlement Agreement shall be binding on it and its successors and assigns and shall run with the title to the land on which the Project is to be constructed.

5) VNRC shall withdraw and seek a dismissal with prejudice of its appeals of the operational stormwater permit, the NPDES construction permit, and the aspects of its appeals of the site plan and conditional use approval, the subdivision approval and the Act 250 Land Use Permit that relate to stormwater and water quality issues.

- 2 -

q b

6) The Environmental Court shall alter and amend the Act 250 permit by deleting Conditions 11 and 12, since the monitoring requirements of Conditions 11-12, are obviated by the offsets.

7) Condition 13 of the Act 250 permit (altered) is deemed satisfied by JLD's provision of the offsets, and the Court shall alter and amend Condition 13 of the Act 250 permit by deleting the same and inserting the following language:

> JLD has agreed to shall construct and maintain offset projects described in attachment (or exhibit) () and made part hereof, within the Stevens Brook Watershed that will help ensure that the project will not cause or contribute to a violation of the water quality standards.

8) ANR shall withdraw and seek a dismissal with prejudice of its cross appeal of the Act 250 Land use Permit.

VERMONT NATURAL RESOURCES COUNCIL, NORTHWEST CITIZENS FOR RESPONSIBLE GROWTH, MARIE FREY AND RICHARD HUDAK

By:_____
   Jon M. Groveman, Esq.
   Their Attorney

VERMONT AGENCY OF NATURAL RESOURCES

By:_____
   Judith L. Dillon, Esq.
   Its Attorney

WATER RESOURCES PANEL OF THE VERMONT NATURAL RESOURCES BOARD

By:_____
   Mark L. Lucas, Esq.
   Its Attorney

97

6) The Environmental Court shall alter and amend the Act 250 permit by deleting Conditions 11 and 12, since the monitoring requirements of Conditions 11-12, are obviated by the offsets.

7) Condition 13 of the Act 250 permit (altered) is deemed satisfied by JLD's provision of the offsets, and the Court shall alter and amend Condition 13 of the Act 250 permit by deleting the same and inserting the following language:

> JLD shall construct and maintain offset projects described in Appendixes A-K attached hereto and made part hereof, within the Stevens Brook Watershed that will help ensure that the project will not cause or contribute to a violation of the water quality standards.

8) ANR shall withdraw and seek a dismissal with prejudice of its cross appeal of the Act 250 Land use Permit.

VERMONT NATURAL RESOURCES COUNCIL, NORTHWEST CITIZENS FOR RESPONSIBLE GROWTH, MARIE FREY AND RICHARD HUDAK

By:_____
      Jon M. Groveman, Esq.
      Their Attorney

VERMONT AGENCY OF NATURAL RESOURCES

By:_____
      Judith L. Dillon, Esq.
      Its Attorney

WATER RESOURCES PANEL OF THE VERMONT NATURAL RESOURCES BOARD

By:_____
      Mark L. Lucas, Esq.
      Its Attorney

6) The Environmental Court shall alter and amend the Act 250 permit by deleting Conditions 11 and 12, since the monitoring requirements of Conditions 11-12, are obviated by the offsets.

7) Condition 13 of the Act 250 permit (altered) is deemed satisfied by JLD's provision of the offsets, and the Court shall alter and amend Condition 13 of the Act 250 permit by deleting the same and inserting the following language:

> JLD shall construct and maintain offset projects described in Appendixes A-K attached hereto and made part hereof, within the Stevens Brook Watershed that will help ensure that the project will not cause or contribute to a violation of the water quality standards.

8) ANR shall withdraw and seek a dismissal with prejudice of its cross appeal of the Act 250 Land use Permit.

VERMONT NATURAL RESOURCES COUNCIL, NORTHWEST CITIZENS FOR RESPONSIBLE GROWTH, MARIE FREY AND RICHARD HUDAK

By:_____
      Jon M. Groveman, Esq.
      Their Attorney

VERMONT AGENCY OF NATURAL RESOURCES

By:_____
      Judith L. Dillon, Esq.
      Its Attorney

WATER RESOURCES PANEL OF THE VERMONT NATURAL RESOURCES BOARD

By:_____
      Mark L. Lucas, Esq.
      Its Attorney

99

LAND USE PANEL OF THE VERMONT
NATURAL RESOURCES BOARD

By:_____
       Mark L. Lucas, Esq.
       Its Attorney


TOWN OF ST. ALBANS


By:_____
       David A. Barra, Esq.
       Its Attorney


JLD PROPERTIES OF ST. ALBANS, LLC


By:_____
       Stewart H. McConaughy, Esq.
       Its Attorney

<154178/71@@051.DOC/SHM>

100

LAND USE PANEL OF THE VERMONT
NATURAL RESOURCES BOARD


By:_____
           Mark L. Lucas, Esq.
           Its Attorney


TOWN OF ST. ALBANS


By:_____
           David A. Barra, Esq.
           Its Attorney


JLD PROPERTIES OF ST. ALBANS, LLC


By:_____
           Stewart H. McConaughy, Esq.
           Its Attorney

<354178/7@@04LDOC/SHM>

LAND USE PANEL OF THE VERMONT
NATURAL RESOURCES BOARD

By:_____
      Mark L. Lucas, Esq.
      Its Attorney


TOWN OF ST. ALBANS


By:_____
      David A. Barra, Esq.
      Its Attorney


JLD PROPERTIES OF ST. ALBANS, LLC

By:_____
      Stewart H. McConaughy, Esq.
      Its Attorney

&lt;354178/71@@05LDOC/SHM&gt;

- 4 -

## Appendix A
## Stormwater Sediment Offset Methodology for
## Proposed Wal-Mart
## St. Albans, Vermont

**Executive Summary**

The Vermont Natural Resources Council (VNRC), the Vermont Agency of Natural Resources (ANR), the Vermont Natural Resources Board and JLD Properties of St. Albans LLC (JLD) (represented in the technical negotiations by Ruggiano Engineering) met on October 15, 2008 to discuss settling the stormwater and water quality issues related to the appeals of the proposed St. Albans Wal-Mart. Prior to the mediation session, Ruggiano Engineering presented several potential offset projects and related estimations of their sediment reductions in the watershed. The technical representatives of the parties then began a series of conversations to seek consensus on a model or models that would estimate construction and stormwater sediment loads as well as determine the amount of sediment "offset" by the proposed mitigation projects.[1] Finally, offset projects were identified and agreed to in order to mitigate both operational and construction stormwater discharges related to the proposed Wal-Mart project. This document serves as a presentation of the methodologies, assumptions, and outcome of the settlement process.

Ruggiano Engineering presented a Proposed Stormwater Offset Plan to the parties. Representatives from Ruggiano Engineering, ANR, and VNRC then visited the site locations of each offset and agreed on the validity of the offset projects.

The values used in the offset calculations and models were discussed and adjusted, where appropriate, to reflect consensus of the group using reasonable or conservative estimates for input variables into the models to estimate sediment reductions in the watershed. Estimations of the quantity of proposed sediment load to be released during construction and during the operational phase of the project were also estimated.

The parties then compared the discharges produced to the offset reductions. Additional offset projects were identified until the amount of sediment generated from all releases was estimated to be offset by the proposed offset projects.

---

[1] Chapter 22 of the VT Environmental Protection Rules, ANR Department of Environmental Conservation, Water Quality Division, Stormwater Management Rule for Stormwater-Impaired Waters defines "Offset" or "offset project" to mean: "a state-permitted action or project within a stormwater-impaired water that a discharger or a third person may complete to mitigate the impacts that an existing or proposed discharge or discharges of regulated stormwater runoff has or is expected to have on the stormwater-impaired water".

A summary of the results is presented below.

|  | Approximate tons/year |
| --- | --- |
| Increases in Sediment in Stevens Brook | 29 |
| Decreases of Sediment in Stevens Brook | 32 |
| Net increase/decrease | -3 |

*Table 1. Estimate of sediment loading as a result of the construction of offset projects in the Stevens Brook watershed.*

## Background and Baseline

The proposed Wal-Mart would discharge stormwater to a tributary of Stevens Brook. Stevens Brook is on the State of Vermont's 303(d) list of impaired waters that do not meet the Vermont Water Quality Standards (VWQS). ANR has determined that agricultural runoff and morphological instability are causing the impairments in the reach of Stevens Brook at the project site. Pollutants contributing to the impairment include excessive sediment and nutrients. Lake Champlain is listed by ANR as impaired for phosphorous, which is a nutrient.

VNRC's/NWCRG's position is that because Stevens Brook is impaired for sediment and nutrients, no additional sediment or nutrients can be assimilated by the stream and, accordingly, any discharge of sediment and nutrients from the project must be offset. ANR and JLD do not necessarily agree that such offsets are required, but in view of the offsets JLD has agreed to provide regardless, any disagreement is moot in this proceeding. The offset projects discussed herein were designed to offset all the sediment and nutrients that are estimated to be discharged from the proposed St. Albans Wal-Mart to Stevens Brook. That is, a "net zero" baseline was utilized to ensure that any sediment created from the construction of the proposed project, the construction of any offset projects, and from the operation of the proposed project would all be offset. Accordingly, this settlement memorializes the offset of:

- Short-term releases of sediment during the construction and stabilization of the offset projects;
- Longer-term releases of sediment during the stabilization of the in-stream offset project to fluvial geomorphic equilibrium;
- Sediment released during construction of the project (construction stormwater sediment discharges); and
- Post-development (operational stormwater sediment discharges)

While the offset plan does not propose to explicitly mitigate for discharges of nutrients and other pollutants, because sediment is the mechanism by which most pollutants are transported, it is assumed, in this case, that a decrease in these pollutants will result as well. The extent to which the reduction in nutrients will occur has not been modeled or estimated.

## Offset Project Descriptions

To effectively offset all sediment discharges to Stevens Brook from construction and operational activities, a total of three offset projects were required.

The projects are summarized in Table 2.

| Offset Project | Type of sediment discharges offset |
|---|---|
| On-site gully erosion stabilization | Stream crossing discharges<br>Fluvial geomorphic stabilization discharges<br>Construction stormwater discharges |
| Streambank stabilization and culvert replacement | Operational stormwater discharges |
| Interception swale construction and streambank plantings | Stream crossing discharges<br>Fluvial geomorphic stabilization discharges<br>Construction stormwater discharges |

*Table 2. Summary of offset projects and type of sediment discharges offset by each offset project.*

### Offset Project 1: On-site Gully Erosion Project

The first project is located approximately 400 feet west of the proposed store footprint and at the western edge of the current cornfield. At the edge of the field, the gully begins as a stable channel, approximating the dimensions of a footpath. As the path runs towards Stevens Brook and over a sharp change in slope, an approximately 70-foot long by 5-foot deep by 8-foot wide gully has developed. The Applicant will stone line the channel and sides of this gully to arrest further erosion of the channel from overland flow. The Applicant will armor the channel with Vermont Agency of Transportation (VTrans) Type II specification rip rap stone sufficient to withstand erosive velocities. Stone will be installed to a minimum depth of two feet and will be underlain by geotextile fabric. Stone check dams will also be installed at two foot elevation intervals along the channel length to slow flow velocities. In addition, stormwater runoff currently flowing from the cornfield to the gully location will be intercepted by a grass swale once the Wal-Mart site is developed. Storm flows will be redirected into the stormwater detention pond that in turn will reduce the flow volume realized at the gully location and slow further erosion. A site plan illustrating the proposed improvements at the on-site gully location and standard details of a stone line channel and stone check dam are provided in Appendix I.

## Offset Project 2: Culvert Replacement Project

The second project is located on a 129.9 acre farm owned by Jeff Boissoneault at 1785 Kellogg Road. The site is located on the west side of Kellogg Road, approximately one-half mile south of Lower Newton Road and approximately three miles downstream of the project site. The current stream crossing is an undersized and deteriorating eight-foot diameter underground storage tank with the ends cut off. The top of the culvert has partially collapsed and the concrete footing and headwall appeared to be broken and undermined. Increased stream velocities downgradient of the undersized culvert have resulted in a large area (approximately 100 feet by 75 feet) being scoured away over time, causing and increasing bank erosion and instability. The Applicant will replace the existing culvert with a bridge to eliminate stream bank erosion and scouring and to avoid catastrophic failure. The Applicant will remove and dispose of the existing culvert and damaged headwall. In its place new poured concrete headwalls will be installed and the stream crossing span will be increased from 8 feet to approximately 15 to 20 feet (equivalent to 1.5 times the normal channel width). The new stream crossing will be approximately 18 feet wide, sufficient to accommodate modern farming equipment. The Applicant will install steel 'I' beams across the new headwalls and secure 3-inch thick timbers across the 'I' beams for the travel way. The stream crossing is intended to serve as an agricultural travel route and will not meet VTrans specifications for automobile traffic. A site plan illustrating the proposed culvert replacement location and construction details is provided in Appendix J.

## Offset Project 3: Interception Swale Construction and Streambank Plantings

The third stormwater offset project is also on the 129.9 acre farm owned by Jeff Boissoneault at 1785 Kellogg Road. A five-acre agricultural field presently drains to a topographic low spot adjacent to Stevens Brook approximately 200 feet northeast of the proposed stream crossing offset. Little to no stream buffer is present at the topographic low spot and has contributed to streambank and rill erosion along Stevens Brook and has afforded minimal sediment removal from the upslope agricultural field. The offset includes construction of an earth berm and an interception swale/grass channel at the topographic low spot to redirect storm flows away from the eroded stream bank and over an established vegetated area. The offset includes planting approximately twenty willow tree saplings and 15 willow shrubs at the outfall of the grass swale to promote sheet flow and improve stream bank stabilization. Willow shrub plantings will also be made on the earth berm to stabilize soils and delineate the edge of the agricultural field. A plan illustrating the proposed stormwater offset improvements is included in Appendix K.

### Estimating Sediment Loads

Seven estimates were necessary to calculate the total sediment loads and losses. These estimates are summarized in the following table:

- Sediment discharged during construction.
- Sediment discharged during the operation of the project.
- Sediment discharge for the short-term in-stream releases associated with the construction of the offset projects.
- Sediment discharges during fluvial geomorphic stability process.
- Sediment reduction associated with the culvert replacement project.
- Sediment reduction associated with the on-site gully erosion project.
- Sediment reduction associated with the interception swale and streambank planting project.

For a detailed description of the models and calculations used, see Appendixes B – H.

Because no standard method of quantifying sediment loading from construction or from the construction of the offset projects was available, Ruggiano Engineering utilized the Technical Guidance for the Evaluation of Non-Impervious Surface Treatment Offset Projects (NISTOP) within impaired watersheds as a guide.

The amount of sediment currently being discharged (or that would be discharged during catastrophic failure) by the offset projects was calculated per the methods identified in Table 3.

| Increases in Sediment in Stevens Brook | Method |
|---|---|
| Construction stormwater | RUSLE |
| Operational stormwater | See 3655-INDS |
| Construction of offset (culvert replacement) | EPA Region 5 |
| Fluvial geomorphic adjustment of stream channel at culvert replacement | Geometry and professional judgment |

| Decreases of Sediment in Stevens Brook | |
|---|---|
| Gully stabilization on-site | EPA Region 5 |
| Culvert replacement/streambank stabilization | Geometry & EPA Region 5 |
| Interception swale and streambank plantings | STEPL, HydroCAD, Manning's Equation |

*Table 3. Methods used to estimate sediment increase or decrease in Stevens Brook watershed.*

## Fundamental Assumptions in Offset Calculations

Because of the inherent uncertainties and margins of error for each of the models utilized, the parties used reasonable (based on collective best professional judgment) or

167

conservative estimates wherever possible.[2] These assumptions and their corresponding level of protection are summarized in Table 4.

| Assumptions | Category |
|---|---|
| **On-Site Gully Stabilization** | (decrease) |
| BMP efficiency of 0.8 | reasonable |
| | |
| **Culvert Replacement with Bridge** | (decrease) |
| BMP efficiency of 75% | reasonable |
| Margin of safety per NISTOP of 5 | reasonable |
| | |
| **Streambank Stabilization** | (decrease) |
| Default soil nitrogen and phosphorus concentrations | reasonable |
| | |
| **Interception Swale and Streambank Plantings** | (decrease) |
| BMP efficiency of 50% | reasonable |
| | |
| **On-Site Construction Discharges** | (increase) |
| Erosivity factor of 75 | reasonable |
| Erodibility factor of 0.32 (average of soil types) | reasonable |
| Slope length factor of 0.8 and 0.18 (two slopes) | reasonable |
| Max slope length of 400 feet | conservative |
| Cover factor of 0.02 for mulch at 2 tons/acre and 1 for bare soil | reasonable |
| Practice factor of 1.2 | conservative |
| 60% BMP efficiency | reasonable |
| Sediment delivery ratio of 0.7 | reasonable |
| Runoff volume less than basin capacity | conservative |
| | |
| **Stream Crossing Construction Discharges** | (increase) |
| 1% of catastrophic failure sediment load | reasonable |
| released during construction (with BMPS in place) | |

---

[2] This approach was considered in: A Scientifically Based Assessment and Adaptive Management Approach to Stormwater Management (Stormwater Cleanup Plan Framework) in State of Vermont Water Resources Board RE: Investigation into Developing Cleanup Plans for Stormwater Impaired Waters - Docket No. INV-03-01 Order Closing Docket and Issuance of Final Report for Comment http://www.vtwaterquality.org/stormwater/docs/sw_inv-03-01report.pdf. This document stated, "Because of the scientific uncertainties associated with predicting stream responses and the effectiveness of stormwater management, a margin of safety must also be incorporated into the stormwater management plan. This margin of safety could be accomplished by using conservative assumptions in the modeling used to select the loadings targets, by selecting conservative targets, by using uncertainty analysis to estimate appropriate ranges of response, or by a combination of these approaches. Ultimately, the margin of safety for each watershed will be based on site specific information and best professional judgment." The parties sought to emulate a similarly conservative approach within this process.

108

| **Fluvial Geomorphic Equilibrium** | (increase) |
| Assume 10% of total available sediment load is transported over a 5 year period | reasonable |

| **Operational Stormwater Releases** | (increase) |
| used 2002 Stormwater Manual | reasonable |

*Table 4. Assumptions and margin of safety used in models involved in calculating offset sediment loads.*

## Model Results

While the models are not definitive and are based on a number of assumptions, the parties agreed that they represent a reasonable estimate. Ultimately, it is estimated that construction of the offset projects will result in approximately a 3 ton/year decrease from a zero baseline in the amount of sediment entering the Stevens Brook watershed. The results for each model can be found in Appendix A – G. A summary of the results is presented in Table 5.

| Increases in Sediment in Stevens Brook | | Approximate tons/year |
|---|---|---|
| Construction stormwater | | 10 |
| Operational stormwater | | 5 |
| Construction of offset (culvert replacement) | | 4 |
| Fluvial geomorphic adjustment of stream channel at culvert replacement | | 10 |
| | Total discharges | 29 |
| Decreases of Sediment in Stevens Brook | | |
| Gully stabilization on-site | | 20 |
| Culvert replacement/streambank stabilization | | 7 |
| Interception Swale and Streambank Plantings | | 5 |
| | Total offsets | 32 |
| | Total reduction | 3 |

*Table 5. Summary of total increases and decreases of sediment in Stevens Brook watershed for construction of project and associated offset projects.*

## Summary

JLD and NWCRG/VNRC have agreed to the process outlined in this methodology and to the construction of the described offset projects. The construction of these projects will result in a net decrease of approximately 3 tons/year of sediment into Stevens Brook, measured against a baseline of zero discharge.

## Appendix B
## Model of sediment discharged during construction using RUSLE.

Soil Loss from Construction Site

$A = R \times K \times LS \times C \times P$

Where: A= average soil loss (tons acre year)
R= erosivity factor (estimated to be 75 at this site)
K= erodibility factor (based on NRCS soils data for Massena and Georgia stony loam) (estimated at 0.32 for entire site)
LS= slope length factor (based on horizontal slope length and 0% grade)
C= cover management factor (assumes permanent seedings and mulch application rate of 2 ton acre) (estimated at 0.01 for entire site considering approved EPSC)
P= practice factor (assumed rough irregular surface with equipment tracks in all directions) (estimated to be 0.9 site wide)

For Bare Soil Disturbances-

Phase 1 (May 1 thru June 1) (upper portion of site)
$A = R \times K \times LS \times C \times P$
$A = 75(0.32)(0.8)(1)(1.2)$
$A = 23$ tons/ac/yr
$A = 23$ tons/ac/yr x 3.4 acres (avg.) x 10% (based on NYS monthly percent of annual erosion index)
$A = 8$ tons

Phase 2 - 5 (June 1 thru Oct 1) (lower portion of site)
$A = 75(0.32)(0.18)(1)(1.2)$
$A = 5.18$ tons/ac/yr x 4.0 acres (avg) x 70%
$A = 14.5$ tons

Phase 6 (May 1 - July 1) (lower portion of site)
$A = 75 (0.32)(0.18)(1)(1.2)$
$A = 5.18$ tons/ac/yr x 4.3 ac x 25%
$A = 5.6$ tons

For Stabilized Portions of the Site-

Phase 1 (upper portion of site)
$A = 75(0.32)(0.8)(0.02)(1.2)$
$A = 0.46$ tons/ac/yr x 13 ac
$A = 6$ tons/yr

Phase 2 - 6 (lower portion of site)
$A = 75(0.32)(0.18)(0.02)(1.2)$
$A = 0.10$ tons/ac/yr x 27 ac
$A = 2.8$ tons/yr

Total estimated sediment load = 37 tons/year soil loss

Construction related discharges of sediment from sediment basin to tributary of Stevens Brook

Apply a 60% BMP efficiency to the temporary sediment basin and an estimated sediment delivery ratio (SDR) of 0.7 to the estimated load:

Total estimated construction phase releases = 10 tons

= 37 tons x (0.4) x (0.7)

Total estimated construction phase releases = 10 tons

## Appendix C
## Model of sediment discharged during the operation of the project.


Based on the STEPL model, Ruggiano Engineering has estimated that the post development load from the JLD site is 4.9 tons per year. For specific calculations, refer to Discharge Permit 3655-INDS.

## Appendix D
## Model of sediment discharge for the short-term releases associated with the construction of the offset projects.

### Stream Crossing Construction Related Releases

In order to estimate the short-term sediment load that will result from constructing the stream crossing improvement it is first necessary to calculate the maximum sediment load that would be realized during a catastrophic failure of the existing crossing with a new out-flanked channel. Any estimate of construction related discharges would be considerably less than the catastrophic failure if appropriate construction BMPs are implemented.

Approximate volume of soil loss due to new out-flanked channel:
Volume = 15 ft wide x 50 feet long x 10 feet high
= 7,500 cu. ft.

Determine sediment load based on 0.05 tons per cu. ft.
= 7,500 cu ft x 0.05 ton/ cu ft
= 375 tons

Assume 1% of catastrophic failure sediment load released during construction using appropriate BMPs
= 375 tons x 0.01 = 3.75 tons

113

## Appendix E
## Model of sediment discharges during fluvial geomorphic stability process.

### Stream Crossing Post-Construction Related Releases

It is anticipated that following the construction of the new stream crossing deposited sediment upstream will be mobilized and transported as Stevens Brook attempts to achieve a fluvial geomorphic equilibrium condition. This condition is anticipated as the outfall from the current crossing cascades approximately two feet to reach the stream elevation downgradient of the crossing. The new stream crossing will eliminate the cascading effect at the outfall and a portion of the currently deposited sediment behind the culvert will be released. Based on USGS topographic maps, the approximate slope of Stevens Brook in this area is 0.2%. Therefore the impact of the adjusted culvert elevation will be realized a maximum of 1,000 feet upstream (2 ft cascade at outfall / 0.002 ft/ft). In order to estimate the post development sediment load at the stream crossing to reach the fluvial geomorphic equilibrium condition, first calculate the maximum volume of sediment that could be released based on the proposed elevation change as follows:

Volume = 2 ft elevation change x 1,000 ft stream length x 10 ft channel width x 0.5
        = 10,000 cu ft.

Assume 10% of total available sediment volume is transported over a 5 year period to achieve FGEC

Volume = 10,000 cu. ft. x 0.1 / 5 years
        = 200 cu. ft. /year

Determine sediment load based on 0.05 tons per cu. ft.
        = 200 cu ft x 0.05 ton/ cu ft
        = 10 tons / year

## Appendix F
## Model of sediment reduction associated with culvert replacement project.

Ruggiano Engineering utilized the EPA Region 5 worksheet to estimate sediment load reductions that will be accomplished at the proposed stream crossing replacement. The area of stream bank erosion was determined using aerial photography and on-site measurements. The length of Stevens Brook that is believed to be impacted by the undersized culvert is approximately 250 feet and the height of the stream bank height is estimated to be 10 feet downgradient of the culvert. A lateral recession rate of 0.5 feet per year was assigned to the model based on the presence of several slumps and slips, vegetative overhang, and a "U" shaped channel cross section. A BMP efficiency of 75% was applied to the proposed offset. The estimated sediment reduction at the new stream crossing is projected to be 46.9 tons per year (See Bank #1 on the attached EPA Region 5 worksheet). Following the NISTOP Guidance Document, a Margin of Safety (MOS) of seven was applied to the Region 5 model to account for uncertainty and temporally limited reductions. Therefore, we conservatively estimate the sediment reduction at the proposed stream crossing to be approximately 6.7 tons per year.

**Bank Stabilization**

If estimating for just one bank, put "0" in areas for Bank #2.

Please select a soil textural class:

| | |
|---|---|
| ☐ Sands, loamy sands | ☐ Silty clay loam, silty clay |
| ☐ Sandy loam | ☐ Clay loam |
| ☑ Fine sandy loam | ☐ Clay |
| ☐ Loams, sandy clay loams, sandy clay | ☐ Organic |
| ☐ Silt loam | |

Please fill in the gray areas below:

| Parameter | | Bank #1 | Bank #2 | Example |
|---|---|---|---|---|
| Length (ft) | | 250 | 50 | 500 |
| Height (ft) | | 10 | 8 | 15 |
| Lateral Recession Rate (ft/yr)* | | 0.5 | 0.5 | 0.5 |
| Soil Weight (tons/ft3) | | 0.05 | 0.05 | 0.04 |
| Soil P Conc (lb/lb soil)** | USER | 0.00073 | 0.00073 | 0.0005 | ** |
| Soil N Conc (lb/lb soil)** | USER | 0.0022 | 0.0022 | 0.001 | ** |

\*\* If not using the default values, users must provide input (in  red) for Total P and Total N soil concentrations
\*Lateral Recession Rate (LRR) is the rate at which bank deterioration has taken place and is measured
in feet per year. This rate may not be easily determined by direct measurement. Therefore best professional
judgement may be required to estimate the LRR.  Please refer to the narrative descriptions in Table 1.

**Estimated Load Reductions**

| | BMP Efficiency* Bank #1 | BMP Efficiency* Bank #2 | Bank #1 | Bank #2 | Example |
|---|---|---|---|---|---|
| Sediment Load Reduction (ton/year) | 0.8 | 0.8 | 46.9 | 7.5 | 113 |
| Phosphorus Load Reduction (lb/year) | | | 58.2 | 9.3 | 113 |
| Nitrogen Load Reduction (lb/yr) | | | 175.3 | 28.1 | 225 |

\* BMP efficiency values should be between 0 and 1, and 1 means 100% pollutant removal efficiency.

**Table 1**

| LRR (ft/yr) | Category | Description |
|---|---|---|
| 0.01 - 0.05 | Slight | exposed tree roots. |
| 0.06 - 0.2 | Moderate | Bank is predominantly bare with some rills and vegetative overhang. |
| 0.3 - 0.5 | Severe | Bank is bare with rills and severe vegetative overhang.  Many exposed tree roots and some fallen trees and slumps or slips.  Some changes in cultural features such as fence corners missing and realignment of roads or trails.  Channel cross-section becomes more U-shaped as opposed to V-shaped. |
| 0.5+ | Very Severe | Bank is bare with gullies and severe vegetative overhang.  Many fallen trees, drains and culverts eroding out and changes in cultural features as above.  Massive slips or washouts common.  Channel cross-section is U-shaped and streamcourse or gully may be meandering. |

Source:    Steffen, L.J. 1982. Channel Erosion (personal communication), as printed in "Pollutants Controlled
Calculation and Documentation for Section 319 Watersheds Training Manual," June 1999 Revision;
Michigan Department of Environmental Quality - Surface Water Quality Division - Nonpoint Source
Unit.  EQP 5841 (6/99).

## Margin of Safety of 7.

## Appendix G
## Model of sediment reduction associated with the on-site gully erosion project.

Ruggiano Engineering utilized the EPA Region 5 worksheet to estimate sediment load reductions that will be accomplished at the proposed on-site gully erosion project. The area of gully erosion was determined using topographic survey information collected at the site. The period of gully erosion was known to be approximately five years based on site visits performed by Ruggiano Engineering and VT DEC in 2003 and 2008. The estimated sediment reduction at the new stream crossing is projected to be 19.7 tons per year (see attached EPA Region 5 worksheet).

5/22/2009

### Gully Stabilization

These may include:

Grade Stabilization Structure
Grassed Waterway
Critical Area Planting in areas with gullies
Water and Sediment Control Basins

**Please select a soil textural class:**

| | |
|---|---|
| ⃝ ⸱ Sands, loamy sands | ⃝ ⸱ Silty clay loam, silty clay |
| ⃝ ⸱ Sandy loam | ⃝ ⸱ Clay loam |
| ⦿ ⸱ Fine sandy loam | ⃝ ⸱ Clay |
| ⃝ ⸱ Loams, sandy clay loams, sandy clay | ⃝ ⸱ Organic |
| ⃝ ⸱ Silt loam | |

**Please fill in the gray areas below:**

| Parameter | Gully | Example |
|---|---|---|
| Top Width (ft) | 5 | 15 |
| Bottom Width (ft) | 10 | 4 |
| Depth (ft) | 5 | 5 |
| Length (ft) | 70 | 20 |
| Number of Years | 5 | 5 |
| Soil Weight (tons/ft3) | 0.05 | 0.05 |
| Soil P Conc (lb/lb soil)*   DEFAULT ▾ | 0.00073 | 0.0005 |
| Soil N Conc (lb/lb soil)*   DEFAULT ▾ | 0.0022 | 0.001 |

* If not using the default values, users must provide input (in red) for Total P and Total N soil concentrations

**Estimated Load Reductions**

| | BMP Efficiency* | Gully | Example |
|---|---|---|---|
| Sediment Load Reduction (ton/year) | 0.8 | 19.7 | 7 |
| Phosphorus Load Reduction (lb/year) | | 24.4 | 6 |
| Nitrogen Load Reduction (lb/yr) | | 73.6 | 12 |

* BMP efficiency values should be between 0 and 1, and 1 means 100% pollutant removal efficiency.

The duration of the discharge from the on-site gully stabilization project was documented during site visits made by ANR staff in 2004 and 2008 that indicated significant erosion and large discharges to Stevens Brook in a short period of time. The observed bank condition in 2003 was fair and was in the early stages of bank sloughing while site conditions in 2008 had progressed to deeply cutting side walls and exposed vegetation. A margin of safety was not applied to the on-site location because the actual discharge to Stevens Brook could be calculated accurately using both the Region 5 model and a simple volumetric calculation.

118

## Appendix H
## Model of sediment reduction associated with
## the interception swale and streambank planting project.

Ruggiano Engineering utilized several different models and calculation methods to estimate sediment load reduction from the proposed stormwater offset, including HydroCAD, the US EPA STEPL model, and hand calculations using Manning's equation.

In order to meet the Vermont Stormwater Management Manual, Volume I standards for water quality treatment, it must be demonstrated that a grassed channel will provide a maximum velocity of 1 ft/sec and minimum average residence time of 10 minutes in the channel for a 0.9" storm event. The channel must also meet or exceed certain geometrical standards (including 2 ft. to 8 ft. bottom width, 2:1 or flatter side slopes, etc.). A 120 foot long interception swale / grass channel is proposed and includes a 2 foot wide bottom and 4:1 side slopes. The longitudinal slope in the grass channel is approximately 1% and includes a stabilized stone outfall to prevent scouring. Ruggiano Engineering has determined the maximum velocity in the proposed grassed channel to be 0.1 ft./sec with a minimum average residence time of 13.4 minutes for the water quality storm event. The residence time and velocity were calculated using Manning's equation and an iterative process based on channel slope and cross-sectional geometry, and also using HydroCAD modeling. Detailed calculations and hydrographs from the HydroCAD model are enclosed.

The US EPA's Spreadsheet Tool for Estimating Pollutant Loads (STEPL) was used to determine the sediment load from the agricultural field. Land use was assumed to be "Cropland" for the field and no changes were made to the default values contained with the STEPL model. Universal Soil Loss Equation (USLE) variables used in the model appeared to be appropriate for the observed field conditions. The agricultural field is estimated to generate 10 tons of sediment per year without any treatment or stream buffer.

A conservative stormwater treatment practice removal efficiency of 50% was applied to grass swale resulting in an annual sediment reduction to Stevens Brook of approximately 5 tons. Therefore, the treatment of runoff from the agricultural field will provide an adequate level of additional sediment removal to achieve a true "net zero or less than zero" pollutant discharge for the project.

Grass Channel Design

$$WQ_v = PR_v A$$

$$R_v = 0.05 + 0.009I$$

$$R_v = 0.05 + 0.009 (0) = 0.05$$

$P = 0.9"$
$A = 5.0$ acres ($0.008$ sq. mi.)

$WQ_v = \dfrac{(0.9)(0.05)(5.0)}{12} = 0.019$ ac. ft $= 828$ ft$^3$

## Modified Curve Number

$CN = 1000 / [10 + 5P + 10Q_a - 10\ (Q_a^2 + 1.25\ Q_aP)^{1/2}]$

$P = 0.9"$
$Q_a = PRv = 0.9" \times 0.05 = 0.045"$

$CN = 1000 / [10 + 5(0.9) + 10(0.045) - 10(0.045^2 + 1.25 \times 0.045 \times 0.9)^{1/2}]$

$CN = 78.9$ (Consistent with STEPL model = 78)
(Also consistent with TR-55 Table 2-2b contoured row crops with residue cover; hydrologic soil group B)

## Compute Peak Discharge

Using HydroCAD:
200' sheet flow at 2% on cultivated land; residue >20%
500' shallow concentrated flow on 2% slope, nearly bare and untilled land
$t_c = 29.2$ min $= 0.49$ hr
Initial abstraction($I_a$) $= 0.564$ from TR-55 Table 4-1
$I_a/P = 0.564/0.9 = 0.627$
Unit peak discharge ($q_u$)= +/-170 csm/in

Peak Discharge ($Q_{wq}$) = $q_u * A * WQ_v$
= 170 csm/in $*$ 0.008 sq. mi. $*$ 0.045 in.
= 0.06 cfs

Size a channel and compute the required length to convey the WQ$_v$ storm:

Longitudinal slope = 1%
Bottom width = 2 ft
Side slopes = 4:1

Assume a Manning's 'n' of 0.15 for 4" depth (using Figure D.14, p. 187 of the VSMM, Vol. II)

$Q = va$

$v = \dfrac{1.49}{n}\ (R)^{2/3}\ (S)^{1/2}$

$$R = \frac{A}{W.P.} = \frac{1.1 \text{ ft}^2}{4.64 \text{ ft}} = 0.24$$

$$v = \frac{1.49}{0.15} (0.24)^{2/3} (0.01)^{1/2} = 0.39 \text{ ft/s}$$

$$A = \frac{Q}{v} = \frac{0.06 \text{ ft}^3/s}{0.39 \text{ ft/s}} = 0.15 \text{ ft}^2$$

So depth is $\approx$ 0.75", thus the assumed Manning's 'n' was okay

Double check v for 0.75" flow depth:

$$R = \frac{A}{W.P.} = \frac{0.17 \text{ ft}^2}{2.5 \text{ ft}} = 0.07$$

$$v = \frac{1.49}{0.15} (0.07)^{2/3} (0.01)^{1/2} = 0.17 \text{ ft/s}$$

$$A = \frac{Q}{v} = \frac{0.06 \text{ ft}^3/s}{0.17 \text{ ft/s}} = 0.35 \text{ ft}^2$$

Interpolating:

$$R = \frac{(0.35 - 0.17)}{(1.1 - 0.17)} \times (0.24 - 0.07) + 0.07 = 0.10$$

$$v = \frac{1.49}{0.15} (0.10)^{2/3} (0.01)^{1/2} = 0.22 \text{ ft/sec}$$

For a 10 minute average residence time, the channel length must equal or exceed:

$$L = (v)(t)$$

$$= 0.22 \text{ ft/s} \times 10 \text{ min} \times 60 \text{ sec/min} = 132 \text{ feet}$$

Provide 120' grass swale leading from bermed area adjacent to Stevens Brook to provide sufficient residence time and velocity to meet the requirements for treatment by grass channel, in accordance with the 2002 VSMM. Provide stabilized outfall and approximately 100 feet of sheet flow length to Stevens Brook from the grass swale outfall. Include 15 to 20 willow plantings at the outfall to the grass channel to promote sheet flow and improve streambank stabilization.

Calculated average and minimum residence times based on HydroCAD model of proposed channel:

Average velocity = 0.1 fps
Maximum velocity = 0.1 fps

Average travel time = 20.7 min
Minimum travel time = 13.4 min

From STEPL model, estimated annual sediment loading from field is approximately 10 tons
Conservatively assume STP efficiency of 50% for Grass Channel
Approximate sediment load reduction 5 tons/year

## Appendix I
## Gully Erosion Stabilization Plan



123

**Appendix J**
**Culvert Replacement Plan**



NOT FOR CONSTRUCTION

124

## Appendix K
### Interception Swale and Streambank Planting Plan.



**EXHIBIT 1**

126

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is between the **CITY OF ST. ALBANS** (the "City") and **JLD PROPERTIES OF ST. ALBANS, LLC** ("JLD Properties") and relates to the City's appeal to the Vermont Environmental Court of the Act 250 Permit (the "Permit") issued to JLD Properties for the so-called Wal-Mart project in the Town of St. Albans (Land Use Permit No. 6F0583 and Land Use Permit No. 6F0583 (Altered); the "Project") and also any objections or concerns by the City with respect to any other governmental permit or approval obtained or required for JLD Properties to proceed with the Project substantially in accordance with the Permit.

## Background

1. The City expressed concerns about the Project's potential impacts on the City.

2. JLD Properties believes that the impacts on the City are likely to be positive.

3. The Permit provides in Conditions 30 through 32 that JLD Properties is to make certain payments to a department of the City of St. Albans if construction of the Project commences before December 31, 2011, with the precise amount of the payment to be based on the time when construction is commenced.

4. The District Environmental Commission #6, in its findings and conclusions accompanying the Permit, found that Conditions 30 through 32, above, would be sufficient to mitigate any impacts that otherwise might place an unreasonable burden on the City under Act 250's Criterion 7 or that otherwise might unnecessarily or unreasonably endanger public or quasi-public investments in the City under Criterion 9(K).

5. The City and JLD Properties have amicably resolved their differences about the impacts of the Project on the City, and have agreed that so long as JLD Properties (and any successors or assigns) performs its obligations under this Agreement, the City's position in this matter is that the Act 250 criteria under which it has party status will be satisfied.

NOW, THEREFORE,

The City and JLD Properties agree as follows:

Section 1. The City will forthwith withdraw its appeal to the Environmental Court with respect to the Permit, and, unless obligated by rule, subpoena or order, will not directly or indirectly support or participate in any appeals of or objections to the Project (so long as the Project remains substantially as approved in the Permit), whether in the Environmental Court or otherwise, and, unless obligated by rule, subpoena or order, will not directly or indirectly advance or support any objections with respect to any other governmental permit or approval obtained or required for JLD Properties to proceed with the Project substantially in accordance with the Permit.

Section 2. If "Substantial Construction" (as hereinafter defined) on the Project first occurs by December 31, 2009 JLD Properties shall pay $500,000 to the City ($350,000 upon occurrence of such construction and $150,000 within one year thereafter). The payment shall be $400,000 if Substantial Construction first occurs by December 31, 2010 ($300,000 and $100,000); shall be $300,000 if Substantial Construction first occurs by December 31, 2011 ($250,000 and $50,000); and no payment under this Section 2 shall be due if Substantial Construction first occurs thereafter. The payments provided for in this Section 2 shall go directly to the City of St. Albans, for use and application as the City sees fit, rather than requiring that the funds be "made available to SAFF in order that it may carry out its mission and fulfill its vision." "Substantial Construction" shall mean construction of Wal-Mart building improvements costing singly or in the aggregate at least $100,000.

Section 3. JLD Properties shall purchase and renovate, in the Downtown Business District 1 in the City of St. Albans, at least four properties, with an aggregate purchase price of at least $1.5 million, and aggregate renovation investments of at least $1 million. JLD Properties shall seek to identify, acquire and renovate catalyst properties of significance based on their location on prominent streets, historic character, or potential to incent additional investment. At least one building shall be purchased by June 30, 2009, with renovations to be completed within not more than a year thereafter. By each June 30 thereafter through June 30, 2012, JLD Properties shall purchase at least one of the required additional buildings, with renovation of each such building to be completed not more than two years after its purchase. JLD Properties' obligation to proceed with the purchase and renovation of the final three buildings shall be contingent upon the occurrence of Substantial Construction, and if Substantial Construction has not occurred by June 30, 2010, the dates for the purchase of such three additional

-2-

128

buildings, and for the completion of the required renovations, shall be extended by the number of days between June 30, 2010 and the date on which Substantial Construction first occurs.

Section 4. As part of its downtown development activities referenced in Section 3, above, and in addition to any payments made under Section 2, above, JLD Properties shall make payments to the City as follows: $300,000 if such additional payments are paid in full by December 31, 2009; $350,000 if paid in full by December 31, 2010; and $400,000 if paid in full by December 31, 2011. $100,000 of the total will be paid to the City before December 31, 2008, regardless of the occurrence of Substantial Construction. Contingent upon the occurrence of Substantial Construction, the balance of the payments provided for in this Section 4 will be due at JLD Properties' discretion but in any event not later than December 31, 2011, with the amount of such payment to be based on the schedule provided above (that is, an additional $200,000 if paid in full by December 31, 2009; an additional $250,000 if not paid in full until later than December 31, 2009 but not later than December 31, 2010; and an additional $300,000 if not paid in full until later than December 31, 2010 but not later than December 31, 2011). If Substantial Construction has not occurred by December 31, 2011, the outside date for payment of the amounts provided for in this Section 4 shall be extended by the number of days between December 31, 2011 and the date on which Substantial Construction first occurs. These payments are not refundable and shall be paid directly to the City of St. Albans, for use and application as the City sees fit.

Section 5. If Substantial Construction occurs, JLD Properties shall pay liquidated damages to the City at the rate of $200,000 per building to the extent JLD Properties fails to purchase and renovate at least four buildings as provided in Section 3, above. For the avoidance of doubt, that means that if Substantial Construction occurs and JLD Properties does not purchase and renovate at least four buildings as provided in Section 3, above, it will owe the City liquidated damages of (i) $200,000 multiplied by (ii) four minus the number of buildings so purchased and renovated.

Section 6. In exchange for the payments provided for in Section 4, above, JLD Properties will be a major development partner with the City on the downtown core project. Any definitive agreement would have to be on terms satisfactory to the City and JLD Properties. In concept, JLD Properties would work with the City to explore options for making that project happen. Without limitation, JLD Properties' efforts could include brokerage, site planning and development. Contingent upon the occurrence of Substantial Construction (as provided above), JLD Properties will make an initial contribution of $50,000 to the City's downtown core project not later than December 31, 2011. The City, at its sole discretion, may also partner with other developers on the downtown core project.

- 3 -

Section 7. If Substantial Construction occurs, JLD Properties shall provide all traffic improvements required by the District Commission's Act 250 Permit, subject to such additional traffic mitigation, if any, as the Environmental Court may order, and subject to such modifications as the City reasonably agrees provide for equal or better mitigation of traffic safety and congestion impacts that the Project otherwise might create within the City

Section 8. JLD Properties will not construct a movie theater, any sporting goods store (such as a Dick's Sporting Goods), or more than two restaurants as part of its development of the approximately 107-acre site on which the Project is located. Subject to any obligation by rule, subpoena or order, The City will not directly or indirectly oppose any development of the Project site for any use other than those provided in the previous sentence.

Section 9. Subject to full compliance with this Agreement, the City stipulates and agrees that it supports the Wal-Mart project and that compliance by JLD Properties with the terms of this Settlement Agreement is sufficient to satisfy, with respect to the City, all Act 250 economic criteria and all other Act 250 criteria with respect to which the City has party status. If JLD Properties asks the City to testify or participate actively in the appellate proceedings (JLD Properties hereby confirms to the City, and reassures the City, that JLD Properties has no present expectation or intention of doing so, and will make reasonable efforts to try to avoid any need to do so), JLD Properties will reimburse the City for its reasonable expenses going forward (including those of attorneys and experts), and for the costs of City personnel (at the rate of $500 per person per day). Presently, JLD Properties anticipates that a Stipulation from the City will be all that is required.

Section 10. The City and JLD Properties shall execute and file with the Environmental Court a Stipulation and proposed order in the form attached hereto as Exhibit "A."

Section 11. In the event that the Environmental Court denies or fails to grant the Stipulation and proposed order in the form of Exhibit "A" (subject to such changes as may be reasonably satisfactory to the City and JLD Properties) before the deadline for the City to file its prefiled testimony in this matter, currently scheduled for December 15, 2008, JLD Properties stipulates and agrees that it has no objection to an extension of any scheduling deadlines to permit the City to conduct any discovery it deems necessary and file any prefiled testimony by January 30, 2009.

- 4 -

130

Section 12. JLD Properties agrees that if, in the City's reasonable opinion, the conditions of final permits and approvals in this matter provide for payments and other mitigation that are of a scope and/or magnitude less than provided for above, JLD Properties will remain independently bound to the City for the payments and other mitigation provided for herein except to the extent, if at all, JLD Properties is legally prevented from providing it, and that the City shall have the right to enforce this Agreement in accordance with its terms. The City agrees that notwithstanding the provisions of this Agreement if final permits and approvals in this matter provide, in one or more particulars, for traffic mitigation that differs from the traffic mitigation required by the District Commission's Act 250 Permit, but that the City reasonably agrees provide for equal or better mitigation of traffic safety and congestion impacts that the Project otherwise might create within the City, that JLD Properties' traffic mitigation obligations under this Agreement shall to that extent be correspondingly revised and amended.

Section 13. The parties agree to execute, acknowledge, if necessary, and deliver such documents, certificates or other instruments and take such other actions as may be reasonably required from time to time to carry out the intents and purposes of this Settlement Agreement.

Section 14. It is the intention of JLD Properties and the City that the obligations of JLD Properties herein shall run with the real property (the "Property") subject to Land Use Permit No. 6F0583 and Land Use Permit No. 6F0583 (Altered). In the event that the Environmental Court denies or fails to grant the Stipulation and proposed order in the form of Exhibit "A" (subject to changes as may be reasonably satisfactory to the City and JLD Properties), JLD Properties agrees to provide written notice to the City not less than thirty (30) days prior to JLD Properties selling, conveying, granting or otherwise transferring, directly or indirectly, fee ownership of the whole or any portion of the Property. The written notice shall be sent by certified mail, return receipt, addressed to the City of St. Albans, 100 North Main Street, St. Albans, VT 05478, Attn: Dominic Cloud, with a copy to Shems Dunkiel Kassel & Saunders, PLLC, 91 College Street, Burlington, VT 05401, Attn: Brian Dunkiel. Upon receipt of any such written notice, the City shall have the right to immediately record the Notice of Settlement Agreement which is attached as Exhibit "B." The Notice of Settlement Agreement is to be executed at the same time as this Settlement Agreement and held by the City or its legal counsel.

Section 15. This Agreement embodies the entire agreement and understanding between the parties relating to the subject matter hereof, and there are no covenants, promises, agreements, conditions or understandings, oral or written, except as herein set forth. This Agreement may not be amended,

- 5 -

waived or discharged except by an instrument in writing executed by the party against whom such amendment, waiver or discharge is to be enforced.

Section 16. The parties waive the benefit of any rule that this Agreement is to be construed against one party or the other.

Section 17. This Agreement, or any portion thereof, shall be binding on the Parties and their successors and assigns, including any successor or assign of any property subject to Sections 3, 4, 5, or 6, above

Section 18. The laws of the State of Vermont shall govern this Agreement. The Parties hereby submit to the venue and personal jurisdiction of Vermont state and federal courts.

IN WITNESS WHEREOF, the parties, as evidenced by the signatures of their Duly Authorized Agents, do hereby execute this Settlement Agreement this ___ day of _____, 2008.

IN PRESENCE OF:

_Alice E Baker_
Witness

_Audrey A Backland_
Witness

CITY OF ST. ALBANS

By: _____

JLD PROPERTIES OF ST. ALBANS, LLC

By: _____

- 6 -